UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JOHN WILLIAM KAMMIN,

                    Plaintiff,

     – against –

CITY OF NEW YORK, CORIZON HEALTH, INC.,
CORRECTIONAL MEDICAL ASSOCIATES OF
NEW YORK, P.C., TEAM HEALTH HOLDINGS,
INC. d/b/a Psychiatrists Only, LLC, JEAN GRANDOIT,
C.O. STANLEY, C.O. BOYCE, INFINITE ALLEN
WALKER, PEGGY NOEL, ALICIA FALCON, DORA
SCHRIRO, CAROLYN SHABUNIA, JOHN DOE
ENTITIES 1-5, and JOHN DOES 1-100,

                    Defendants.

---

Civil Action No.: 13-CV-3873 (DLC)

**AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

RECEIVED
JAN – 6 2014
U.S.D.C. S.D. N.Y.
CASHIERS

     Plaintiff John William Kammin, by his attorneys, Mark A. Marino, PC, for his Amended

Complaint against Defendants City of New York, Corizon Health, Inc., Correctional Medical

Associates of New York, P.C., Team Health Holdings, Inc. d/b/a Psychiatrists Only, LLC, Jean

Grandoit, C.O. Stanley, C.O. Boyce, Infinite Allen Walker, Peggy Noel, Alicia Falcon, Dora

Schriro, Carolyn Shabunia, John Doe Entities 1-5, and John Does 1-100, alleges, upon personal

knowledge and upon information and belief:

## INTRODUCTION

     1.     On June 7, 2012, Plaintiff John William Kammin ("Plaintiff") was arrested at his

apartment by members of the New York City Police Department, who illegally seized certain of

his daily medications, and was subsequently held in the custody of the New York City

Department of Correction for the following eleven days, although he was set to be released after

eight days.

2.     During this eleven-day stint, Plaintiff was denied medical treatment for his serious psychological injuries, which manifested themselves in a fall and fractured skull (among other things) due to a grand mal seizure, with deliberate indifference by medical staff at the Manhattan Detention Complex and Rikers Island to his medical needs.  Needless to say, one or more of the medical staff engaged in medical malpractice.

3.     After his grand mal seizure, Plaintiff was taken by ambulance to New York Downtown Hospital, where he was only allowed to get up from his gurney and hospital bed once in nine days, and during which time Plaintiff was beaten by correctional officers.

4.     Plaintiff alleges various violations of his civil rights under the Fourth, Eighth, and Fourteenth Amendments to the Constitution of the United States and the federal civil rights laws, along with various state claims.

5.     Plaintiff does not allege the use of excessive force, false arrest, or malicious prosecution by employees of the New York City Police Department in violation of 42 U.S.C. 1983.

6.     Plaintiff requests injunctive relief regarding certain unconstitutional policies set forth below.

7.     Plaintiff requests systemic equitable reform regarding certain unconstitutional policies set forth below.

## JURISDICTION AND VENUE

8.      This Court has original jurisdiction over the instant action, pursuant to 28 U.S.C. §§1331 and 1343, as this is a civil action asserting claims under the federal civil rights laws.

9.      This Court has supplemental jurisdiction over the claims asserted under New York state law pursuant to 28 U.S.C. §1367, as these claims are so related to Plaintiff's claims under the federal civil rights laws that they form part of the same case or controversy.

10.     Venue is proper pursuant to 28 U.S.C. §1391, as the events and transactions giving rise to Plaintiff's claims occurred within this district.

## PARTIES

11.     Plaintiff John Kammin ("Plaintiff") is, and was at the time of the incidents giving rise to this action, a resident of New York County, State of New York.

12.     Defendant City of New York is, and was at the time of the incidents giving rise to this action, a municipal corporation duly organized under, and existing by virtue of, the laws of the State of New York.

13.     Defendant City of New York operates and controls the New York City Police Department (the "NYPD") as a municipal agency.

14.     Defendant City of New York operates and controls the New York City Department of Correction (the "NYCDOC") as a municipal agency.

15.     Defendant Corizon Health, Inc. is a Delaware corporation headquartered at 105 Westpark Drive, Brentwood, Tennessee 37027 ("Corizon").

16.     Defendant Corizon is licensed to conduct business, and does conduct business, in the State of New York.

17.     According to the company website, Defendant Corizon "deliver[s] a wide range of healthcare and pharmacy programs to government agencies for the medical care of inmates" to over four hundred correctional facilities across the United States, including the correctional facility at Rikers Island and the Manhattan Detention Complex.

18.     Defendant Corizon (and/or its predecessor(s), including, but not limited to, Prison Health Services) had, at the time of the incidents giving rise to this action, a contract with Defendant City of New York to deliver a wide range of healthcare and pharmacy programs at Rikers Island and the Manhattan Detention Complex.

19.     Defendant Corizon (and/or its predecessor(s), including, but not limited to, Prison Health Services) has had a contract with Defendant City of New York to deliver a wide range of healthcare and pharmacy programs at Rikers Island and the Manhattan Detention Complex since at least 2001.

20.     Defendant Corizon is, and was at the time of the incidents giving rise to this action, acting under color of state law.

21.     Defendant Correctional Medical Associates of New York, P.C. is a New York domestic professional corporation ("CMANY").

22.     Defendant CMANY was formerly known as PHS Medical Services, P.C.

23.     Defendant CMANY, an affiliate of Defendant Corizon, is headquartered at the same location – 105 Westpark Drive, Suite 200, Brentwood, Tennessee 37027.

24.     Defendant CMANY employs medical professionals, including psychiatrists, who, upon information and belief, apply for employment through the following email address: hr@corizonnyc.com.

25.     Defendant CMANY had, at the time of the incidents giving rise to this action, a contract with Defendant City of New York to deliver a wide range of healthcare and pharmacy programs at Rikers Island and the Manhattan Detention Complex.

26.     Defendant CMANY (and/or its predecessors and affiliates) has had a contract with Defendant City of New York to deliver a wide range of healthcare and pharmacy programs at Rikers Island and the Manhattan Detention Complex since at least 2001.

27.     Defendant CMANY is, and was at the time of the incidents giving rise to this action, acting under color of state law.

28.     Defendant Team Health Holdings, Inc., d/b/a Psychiatrists Only, LLC, is a publically traded Delaware corporation with its headquarters located at 265 Brookview Centre Way, Suite 400, Knoxville, Tennessee 37919.  Defendant Team Health is the parent company of Psychiatrists Only, LLC ("Psychiatrists Only"), a wholly owned subsidiary (of Defendant Team Health) ("Team Health").

29.     Defendant Team Health, through Psychiatrists Only, LLC, contracted with Defendant Alicia Falcon to obtain employment at Rikers Island.  This contract was executed by Defendant Alicia Falcon in New York State.

30.     Defendant Team Health, through Psychiatrists Only, LLC, exercised control over Defendant Alicia Falcon and gave her instructions for doing her job as a psychiatrist.

31.      Defendant Team Health, through Psychiatrists Only, LLC, exercised control over Defendant Alicia Falcon in a way that went far beyond the usual "staffing agency."

32.     Defendant Jean Grandoit was, at the time of the incidents giving rise to this action, a physician's assistant at the Manhattan Detention Complex, located at 125 White Street,

New York, New York 10013, which is owned and operated by the NYCDOC and Defendant City of New York ("Grandoit").

33.     Defendant Grandoit was, at the time of the incidents giving rise to this action, acting within the scope of employment by Defendant Corizon.

34.     Defendant Grandoit was, at the time of the incidents giving rise to this action, acting within the scope of employment by Defendant City of New York.

35.     Defendant Grandoit was, at the time of the incidents giving rise to this action, acting within the scope of employment by Defendant CMANY.

36.     Defendant Grandoit was, at the time of the incidents giving rise to this action, acting under color of state law.

37.     Defendant C.O. Stanley is a NYCDOC personnel/correctional officer with shield number 12008 ("Stanley").

38.     Defendant Stanley has a primary place of business at the Manhattan Detention Complex, located at located at 125 White Street, New York, New York 10013.

39.     Defendant Stanley was with Plaintiff on the following dates: June 11, 2012, June 12, 2012, and June 18, 2012.

40.     Defendant Stanley was, at the time of the incidents giving rise to this action, acting within the scope of employment by Defendant City of New York.

41.     Defendant Stanley was, at the time of the incidents giving rise to this action, acting under color of state law.

42.     Defendant C.O. Boyce is a NYCDOC personnel/correctional officer with shield number 18222 ("Boyce").

43.     Defendant Boyce has a primary place of business at the Manhattan Detention Complex, located at 125 White Street, New York, New York 10013.

44.     Defendant Boyce was with Plaintiff on the following dates: June 13, 2012 and June 18, 2012.

45.     Defendant Boyce was, at the time of the incidents giving rise to this action, acting within the scope of employment by Defendant City of New York.

46.     Defendant Boyce was, at the time of the incidents giving rise to this action, acting under color of state law.

47.     Defendant Infinite Allen Walker was, at the time of the incidents giving rise to this action, a physician's assistant at the Manhattan Detention Complex, which is owned and operated by the NYCDOC and Defendant City of New York ("Walker").

48.     Defendant Walker was, at the time of the incidents giving rise to this action, acting within the scope of employment by Defendant Corizon.

49.     Defendant Walker was, at the time of the incidents giving rise to this action, acting within the scope of employment by Defendant City of New York.

50.     Defendant Walker was, at the time of the incidents giving rise to this action, acting within the scope of employment by Defendant CMANY.

51.     Defendant Walker was, at the time of the incidents giving rise to this action, acting under color of state law.

52.     Defendant Peggy Noel was, at the time of the incidents giving rise to this action, a psychologist/licensed social worker at the Manhattan Detention Complex, which is owned and operated by the NYCDOC and Defendant City of New York ("Noel").

53.     Defendant Noel was, at the time of the incidents giving rise to this action, acting within the scope of employment by Defendant Corizon.

54.     Defendant Noel was, at the time of the incidents giving rise to this action, acting within the scope of employment by Defendant City of New York.

55.     Defendant Noel was, at the time of the incidents giving rise to this action, acting within the scope of employment by Defendant CMANY.

56.     Defendant Noel was, at the time of the incidents giving rise to this action, acting under color of state law.

57.     Defendant Alicia Falcon was, at the time of the incidents giving rise to this action, a psychiatrist at Rikers Island, which is owned and operated by the NYCDOC and Defendant City of New York ("Falcon").

58.     Defendant Falcon was, at the time of the incidents giving rise to this action, acting within the scope of employment by Defendant Corizon.

59.     Defendant Falcon was, at the time of the incidents giving rise to this action, acting within the scope of employment by Defendant City of New York.

60.     Defendant Falcon was, at the time of the incidents giving rise to this action, acting within the scope of employment by Defendant CMANY.

61.     Defendant Falcon was, at the time of the incidents giving rise to this action, acting within the scope of employment by Defendant Team Health (through Psychiatrists Only).

62.     Defendant Falcon was, at the time of the incidents giving rise to this action, acting under color of state law.

63.     Defendant Dora Schriro is, and was at the time of the incidents giving rise to this action, Commissioner of the NYCDOC ("Schriro").

64.     Defendant Schriro is, and was at the time of the incidents giving rise to this action, a policymaker with the power to contribute to the creation or modification of unconstitutional (or otherwise improper or inferior) NYCDOC policies and protocols, including policies and protocols concerning the psychiatric treatment of prisoners and/or pretrial detainees.

65.     Defendant Schriro is, and was at the time of the incidents giving rise to this action, acting within the scope of employment by Defendant City of New York.

66.     Defendant Schriro is, and was at the time of the incidents giving rise to this action, acting under color of state law.

67.     Defendant Carolyn Shabunia is a detective, with Shield No. 4950, in the NYPD's Special Fraud Unit, located at 300 Gold Street, 6th floor, Brooklyn, New York ("Shabunia").

68.     Defendant Shabunia was, at the time of the incidents giving rise to this action, acting within the scope of employment by Defendant City of New York.

69.     Defendant Shabunia was, at the time of the incidents giving rise to this action, acting under color of state law.

70.     Defendant John Doe Entities 1-5 are legal entities, including, without limitation, any businesses or governmental entities or associations.

71.     Defendant John Doe Entities 1-5 were, at the time of the incidents giving rise to this action, controlling one or more of the individual defendants.

72.     Defendant John Doe Entities 1-5 were, at the time of the incidents giving rise to this action, the employers of one or more of the individual defendants.

73.     Defendant John Doe Entities 1-5 were, at the time of the incidents giving rise to this action, acting under color of state law.

74.     Defendant John Does 1-25 are NYPD personnel/police officers whose names are yet unknown but will become apparent during litigation ("NYPD Officers").

75.     Defendant NYPD Officers accompanied Defendant Shabunia to Plaintiff's apartment on June 7, 2012.

76.     Defendant NYPD Officers are, and/or were at the time of the incidents giving rise to this action, acting within the scope of employment by Defendant City of New York.

77.     Defendant NYPD Officers are, and/or were at the time of the incidents giving rise to this action, acting under color of state law.

78.     Defendant John Does 25-50 are NYCDOC personnel/correctional officers whose names and identities are yet unknown but will become apparent during litigation ("NYCDOC Correctional Officers").  ("NYCDOC Correctional Officers" shall include Defendant Stanley and Defendant Boyce.)

79.     Certain of Defendant NYCDOC Correctional Officers kept Plaintiff shackled to a gurney in the emergency room at New York Downtown Hospital for two days, during which Plaintiff was unable to go to the bathroom, take a shower, or even walk around the room ("NYCDOC Shackling John Does").

80.     Defendant NYCDOC Shackling John Does travelled with Plaintiff to New York Downtown Hospital and were on duty at New York Downtown Hospital from June 10-12, 2012.

81.     Certain of Defendant NYCDOC Correctional Officers used excessive force against Plaintiff on June 18, 2012 ("NYCDOC Force John Does").

82.     Certain of Defendant NYCDOC Correctional Officers kept (held over) Plaintiff in NYCDOC custody after he was released from custody by the court ("NYCDOC Holdover John

Does").  ("NYCDOC Holdover John Does" shall include Defendant Stanley and Defendant Boyce.)

83.     Defendant NYCDOC Holdover John Does were on duty at New York Downtown Hospital from June 15-18, 2012.

84.     Defendant NYCDOC Correctional Officers, including Defendant NYCDOC Shackling John Does, Defendant NYCDOC Force John Does, and Defendant NYCDOC Holdover John Does, were, at the time of the incidents giving rise to this action, acting within the scope of employment by Defendant City of New York.

85.     Defendant NYCDOC Correctional Officers, including Defendant NYCDOC Shackling John Does, Defendant NYCDOC Force John Does, and Defendant NYCDOC Holdover John Does, were, at the time of the incidents giving rise to this action, acting under color of state law.

86.     Defendant John Does 50-75 are medical personnel who were working at the Manhattan Detention Complex ("MDC") between midnight and noon on Sunday, June 10, 2012, and whose names are yet unknown but will become apparent during litigation ("MDC Medical Staff").  ("MDC Medical Staff" shall include Defendant Grandoit.)

87.     Defendant MDC Medical Staff were, at the time of the incidents giving rise to this action, acting within the scope of employment by Defendant City of New York.

88.     Defendant MDC Medical Staff were, at the time of the incidents giving rise to this action, acting within the scope of employment by Defendant Corizon.

89.     Defendant MDC Medical Staff were, at the time of the incidents giving rise to this action, acting within the scope of employment by Defendant CMANY.

90.     Defendant MDC Medical Staff were, at the time of the incidents giving rise to this action, acting under color of state law.

91.     Defendant John Does 75-100 were, at the time of the incidents giving rise to this action, policymakers, supervisors, and wardens with the power to create or modify unconstitutional (or otherwise improper or inferior) NYCDOC policies and protocols, including, but not limited to, policies and protocols regarding the psychiatric treatment of prisoners and/or pretrial detainees whose names are yet unknown but will become apparent during litigation ("Policymakers").

92.     Defendant Policymakers shall include Defendant Schriro.

93.     Defendant Policymakers are, and were at the time of the incidents giving rise to this action, acting within the scope of employment by Defendant City of New York.

94.     Defendant Policymakers are, and were at the time of the incidents giving rise to this action, acting within the scope of employment by Defendant Corizon.

95.     Defendant Policymakers are, and were at the time of the incidents giving rise to this action, acting within the scope of employment by Defendant CMANY.

96.     Defendant Policymakers are, and were at the time of the incidents giving rise to this action, acting under color of state law.

97.     Defendant City of New York, Defendant Corizon, Defendant CMANY, Defendant Team Health, Defendant Grandoit, Defendant Stanley, Defendant Boyce, Defendant Walker, Defendant Noel, Defendant Falcon, Defendant Schriro, Defendant Shabunia, Defendant John Doe Entities 1-5, and Defendant John Does 1-100 (consisting of Defendant NYPD Officers, Defendant NYCDOC Correctional Officers, Defendant NYCDOC Shackling John Does, Defendant NYCDOC Force John Does, Defendant NYCDOC Holdover John Does, Defendant

MDC Medical Staff, and Defendant Policymakers) are hereinafter referred to, collectively, as "Defendants."

## PROCEDURAL REQUIREMENTS

98.    Plaintiff has complied with General Municipal Law Section 50 and all procedural requirements necessary to commence a lawsuit against Defendants, including Defendant City of New York.

99.    This is an action for physical injuries, psychological injuries, and time in confinement, among other things, sustained by Plaintiff arising out of the incidents giving rise to this action.

100.    On or about September 5, 2012, within ninety days after the accrual of the instant action, a satisfactory Notice of Claim was filed with Defendant City of New York, or its agent(s), on behalf of Plaintiff.

101.    On or about November 28, 2012, Plaintiff appeared for, and testified at, a hearing pursuant to Section 50(h) of the General Municipal Law of New York at the request of Defendant City of New York or its agent(s).

102.    Defendant City of New York, and/or its agent(s), has refused or neglected to make any adjustment or payment on Plaintiff's claims (as stated in Plaintiff's Notice of Claim).

103.    Plaintiff filed his original summons and complaint with the court within one year and ninety days of the date of accrual of the instant action.

## FACTUAL ALLEGATIONS

104.    Plaintiff brings this action for various physical, emotional, and psychological damages arising from various acts in violation of the federal civil rights laws and state law.

105.    Most of Plaintiff's injuries stem from the care he received – or rather, did not receive – as a pretrial detainee from the medical staff at the Manhattan Detention Complex and Rikers Island.

106.    Plaintiff suffers from diabetes, hypertension, and various mental conditions, including, but not limited to, anxiety disorder, panic disorder, borderline personality disorder, and bipolar disorder.

107.    Plaintiff takes various medications for his medical problems, such as insulin and various psychological medications, including, but not limited to, a classification of drugs called benzodiazepines (and in particular, Xanax, which is used to treat anxiety disorders).

108.    Benzodiazepines are addictive and, in particular, notorious for their severe withdrawal symptoms when a patient attempts to discontinue use of the drugs – especially when a patient stops using benzodiazepines abruptly ("Benzodiazepine Withdrawal").

109.    Xanax, a benzodiazepine, is highly addictive and notorious for its severe withdrawal symptoms when a patient attempts to discontinue use of the drug – especially when a patient stops using Xanax abruptly ("Xanax Withdrawal").

110.    Defendant Falcon, Defendant Grandoit, Defendant Noel, Defendant Walker, and Defendant MDC Medical Staff, in effect, forced Plaintiff to discontinue his use of Xanax (and other drugs) abruptly, despite an overwhelming amount of information provided by Plaintiff and signs of Xanax Withdrawal (and Benzodiazepine Withdrawal) that rises to a level far beyond any

professional standard of care – as alleged in Plaintiff's medical malpractice claim – to that of deliberate inference to Plaintiff's medical needs in violation of Plaintiff's constitutional rights.

111.    Plaintiff went into Benzodiazepine Withdrawal/Xanax Withdrawal and endured severe medical pain, including, but not limited to, severe headaches, anxiety, mood swings, insomnia, panic attacks, heavy sweating, hallucinations, and eventually, a grand mal seizure.

112.    Plaintiff's seizure, which occurred in the visiting room of the Manhattan Detention Complex, caused him to sustain the following injuries: fractured skull, fractured sinuses, a concussion, permanent brain damage, decrease in cognitive functioning and memory loss, a permanent scar from his fall to the floor, post-concussion syndrome, post-traumatic stress disorder, and an exacerbation of his mental disorders.

113.    Plaintiff was subjected to injuries resulting from certain of Defendants' unconstitutional use of excessive force after his seizure.

114.    Plaintiff was subjected to injuries resulting from certain of Defendants' unconstitutional use of restraints limiting Plaintiff to a bed for nine straight days (with the exception of one bathroom break and shower) after his seizure.

115.    Plaintiff was the subject of false arrest and false imprisonment by certain of Defendants who detained Plaintiff for three days after he was ordered to be released by a judge in the New York State Supreme Criminal Court for the County of New York.

### *Thursday, June 7, 2012*

116.    At approximately 6:30 a.m. on Thursday, June 7, 2012, Plaintiff was arrested in his apartment in New York County.

117.    Plaintiff was diagnosed with Type II diabetes over fifteen years ago and regularly sees an endocrinologist to treat his diabetes.

118.    Plaintiff takes various medications on a daily basis to treat his diabetes.

119.    Plaintiff also suffers from hypertension, for which he takes Atenalol, Inspira, and Lisinopril (prescribed by his doctor).

120.    During the past twenty years, Plaintiff has been clinically diagnosed by psychiatrists with various mental disorders, including, but not limited to, panic disorder, borderline personality disorder, and bipolar disorder.

121.    Plaintiff has regularly seen psychiatrists for approximately twenty years to treat his mental disorders and at the time of his arrest, Plaintiff was taking the following medications to treat his panic disorder, borderline personality disorder, and bipolar disorder, among other things: Xanax, Effexor, Ambien, Librium, and Seroquel.

122.    The aforementioned medications taken by Plaintiff just before the incidents giving rise to this action (and denied to Plaintiff thereafter), are herein referred to, collectively, as the "Medication."

123.    As mentioned above, Xanax is highly addictive and, in particular, is notorious for its severe symptoms when a patient attempts to discontinue use of the drug – especially when a patient stops using the drug abruptly.  The symptoms of Benzodiazepine Withdrawal/Xanax Withdrawal (as defined above) include, but are not limited to, stomach upset, anxiety, mood swings, increased blood pressure, increased heart rate, insomnia, tremor, fever, loss of appetite, heavy sweating, hallucinations, seizures, and, in rare cases, death.

124.    Plaintiff had taken the Medication approximately two hours before his arrest.

125.    During Plaintiff's arrest, NYPD police officers, led by Defendant Shabunia, documented the Medication.

126.    Plaintiff asked the NYPD police officers if he could take the Medication with him but was denied.

127.    The NYPD police officers, led by Defendant Shabunia, took the Medication with them when they left the apartment.

128.    Defendant Shabunia had certain of the Medication tested in a laboratory thereafter to confirm that the drugs were not illegal.

129.    Defendant Shabunia brought the Medication back to Plaintiff's wife days later.

130.    Defendant Shabunia never inventoried the Medication.

131.    Certain NYPD police officers took Plaintiff to the NYPD's 18th Precinct (upon information and belief) for processing.

132.    NYPD police officers took Plaintiff to Bellevue Hospital, where he was given certain medication.

133.    John Doe NYPD Defendants 1-2, two African-American males, approximately thirty years old, approximately six feet tall and well built, took Plaintiff from Bellevue Hospital to Central Booking.  One had a Marine Corps insignia on his gun.  John Doe NYPD Defendants 1-2 told Plaintiff not to alert the EMT on duty at Central Booking to his medical problems.  Plaintiff began to alert the EMT on duty at Central Booking to his medical problems when one of John Doe NYPD Defendants 1-2 elbowed him in the side.  One of John Doe NYPD Defendants 1-2 told the EMT on duty at Central Booking that Plaintiff had been to Bellevue and they had a list of the Medication.  John Doe NYPD Defendants 1-2 presented NYCDOC personnel at Central Booking with paperwork documenting Plaintiff's medical history/diagnoses/treatments, including a list of the Medication.

134.    Plaintiff was taken before a judge and arraigned a few hours later.

135.    Plaintiff's attorney alerted the judge to Plaintiff's serious medical issues and the need for Plaintiff to receive the Medication.

136.    The judge ordered that Plaintiff be given medical attention and the Medication for his medical issues.

137.    Plaintiff was taken back to Central Booking, where he had a panic attack – a symptom of Benzodiazepine Withdrawal/Xanax Withdrawal.

138.    The EMTs on duty at Central Booking tended to Plaintiff but could not bring Plaintiff to the hospital because he was in NYPD custody.

139.    John Doe NYPD Defendants 1-2, who brought Plaintiff to Central Booking – the NYPD police officers who told Plaintiff not to alert the EMT on duty at Central Booking to his medical problems – were supposed to stay with Plaintiff but they had already left.

140.    Hours later, at approximately 11:00 p.m. and after EMTs on duty at Central Booking protested repeatedly, John Doe NYPD Defendants 3-4 took Plaintiff back to Bellevue Hospital.

141.    Plaintiff was eventually seen by medical personnel at Bellevue, one of whom gave Plaintiff a very small dose of Klonopin, a benzodiazepine.

142.    Medical personnel at Bellevue Hospital told John Doe NYPD Defendants 3-4 that Plaintiff should be taken back to Bellevue Hospital every twelve hours.

143.    Plaintiff was never taken back to Bellevue Hospital.

144.    John Doe NYPD Defendants 3-4 took Plaintiff back to Central Booking, where they presented NYCDOC staff with paperwork documenting Plaintiff's medical history/diagnoses/treatments, including the Medication.

**_Friday, June 8, 2012_**

145.    Plaintiff was transferred from Central Booking to the Manhattan Detention Complex early in the morning on Friday, June 8, 2012.

146.    Plaintiff met with medical personnel, who filled out a detailed medical intake form upon his arrival at the Manhattan Detention Complex.

147.    Plaintiff stated that he had been diagnosed with, and treated for, the following illnesses, among others: diabetes (Type II), asthma, hypertension, panic attacks, depression, anxiety, and bipolar disorder.

148.    Plaintiff stated that he was in treatment for his mental illnesses, including, but not limited to, depression, anxiety, panic attacks, and bipolar disorder.

149.    Plaintiff indicated that he was currently taking medications for his psychiatric problems.

150.    Plaintiff stated that mental illness runs in his family.

151.    Plaintiff stated that he has trouble falling and staying asleep.

152.    Plaintiff stated that he experiences changes in appetite or eating habits.

153.    Plaintiff stated that he felt hopeless or worthless.

154.    Defendant Walker recorded the results of Plaintiff's intake on early on Friday morning and generated several different forms, including, but not limited to, an Initial Intake Form, Mental Health Intake History, HIV Data Intake, and Tuberculosis Assessment.  (For reasons unknown, Defendant Walker recreated these same forms, among others, on Monday, June 11, 2012, while Plaintiff was in the emergency room at New York Downtown Hospital after having a seizure, and entered slightly different data.)

155.    As of the time of the intake physical at the Manhattan Detention Complex on early Friday morning, Plaintiff had not taken the Medication for over 24 hours and had not eaten, as none of the food offered to Plaintiff was safe for a diabetic to eat.

156.    Plaintiff told Defendant Walker that he was taking Xanax, among other medications.

157.    Defendant Walker noted that Plaintiff was taking Klonopin, Xanax, and Seroquel, among other things.

158.    Defendant Walker assessed Plaintiff as having Type II diabetes, hypertension, anxiety, and bipolar disorder.

159.    Defendant Walker prescribed medicine for Plaintiff's diabetes.

160.    Defendant Walker prescribed medicine for Plaintiff's hypertension.

161.    Defendant Walker did not prescribe medicine for Plaintiff's anxiety.

162.    Defendant Walker did not prescribe medicine for Plaintiff's bipolar disorder.

163.    Defendant Walker did not prescribe medicine for Plaintiff's panic attacks.

164.    Plaintiff's criminal attorney faxed a letter to the NYCDOC at noon on Friday stating that "medical attention was ordered by the Court" and Plaintiff was currently taking the following medications: Insulin, Seroquel, Xanax, Atenolol, Lisinopril, Glumetza, Pravachol, and Zetia.

165.    On Friday night, Defendant Noel performed a subsequent evaluation of Plaintiff regarding his mental illnesses.

166.    Plaintiff told Defendant Noel that he had been clinically diagnosed with a panic disorder and bipolar disorder over twenty years prior to that time.

167.    Defendant Noel noted Plaintiff's complaints of depressive symptoms, sleep disturbance, panic symptoms, and anxiety symptoms.

168.    Defendant Noel noted that Plaintiff's speech was pressured and his thought process was rambling – symptoms of advanced Benzodiazepine Withdrawal/Xanax Withdrawal.

169.    Defendant Noel noted that Plaintiff stated that he was currently taking Xanax, Seroquel, and Effexor and needed his medications.

170.    Defendant Noel noted that Plaintiff was panicking, sweating, and crying throughout the evaluation – symptoms of advanced Benzodiazepine Withdrawal/Xanax Withdrawal.

171.    Defendant Noel noted that Plaintiff may have had a substance induced mood disorder (prompting serious withdrawal symptoms).

172.    Defendant Noel noted that it was likely that Plaintiff had an SPMI (Serious and Persistent Mental Illness).

173.    Defendant Noel told Plaintiff that the NYCDOC had no medication available at the Manhattan Detention Complex to help with Benzodiazepine Withdrawal/Xanax Withdrawal.

174.    Defendant Noel read to Plaintiff the list of medications available at the Manhattan Detention Complex, none of which were benzodiazepines (such as Xanax).

175.    Defendant Noel called the doctor on call at Rikers Island to discuss Plaintiff's symptoms/behavior and a transfer to Rikers Island.

**_Saturday, June 9, 2012_**

176.    At approximately 2:00 a.m. on Saturday, and almost 48 hours after Plaintiff last took any of the Medication, including Xanax, NYCDOC personnel took him to the psychiatric facility at Rikers Island.

177.    NYCDOC personnel had to help Plaintiff to the psychiatric facility because he was hyperventilating, panicking, and drenched with sweat – symptoms of Benzodiazepine Withdrawal/Xanax Withdrawal.

178.    Plaintiff was strip-searched before entering the psychiatric facility.

179.    Upon information and belief, the psychiatric facility at Rikers Island had, and still has, a sign that explicitly says "No Benzos" in order to alert inmates to the futility of requesting benzodiazepines, including, but not limited to, Xanax.

180.    Upon information and belief, many inmates at the psychiatric facility at Rikers Island do not ask for benzodiazepines, such as Xanax, because of the sign that explicitly says "No Benzos."

181.    Plaintiff was placed in "The Bubble," which is a holding cell within the psychiatric facility where NYCDOC staff – employed by Defendant Corizon and Defendant City of New York – can observe inmates.

182.    Plaintiff eventually met with Defendant Falcon, a psychiatrist at Rikers Island, at approximately 2:00 a.m. on Saturday morning.

183.    Plaintiff explained to Defendant Falcon that he was experiencing withdrawal and was afraid his life was in danger.

184.    Plaintiff told Defendant Falcon that he was taking Xanax, Effexor, Seroquel, and Ambien, among other things.

185.   Plaintiff specifically told Defendant Falcon that he was taking 1 mg of Xanax four times per day (a total of 4 mg).

186.   Plaintiff made the following complaints to Defendant Falcon: depression, hopelessness, helplessness, guilt, worthlessness, sleep disturbance, anxiety, compulsive behavior, sleep changes, loss of sleep, hypervigilance, panic, heart palpitations, diaphoresis and excessive sweating, and shortness of breath – all symptoms of Benzodiazepine Withdrawal/Xanax Withdrawal.

187.   Defendant Falcon noted that Plaintiff had received benzodiazepines in federal prison in 2010 to treat Benzodiazepine Withdrawal/Xanax Withdrawal (although this was actually in 2000).

188.   Defendant Falcon was under the impression that Plaintiff had received benzodiazepines in federal prison less than two years earlier.

189.   Defendant Falcon diagnosed Plaintiff with a panic disorder, mood disorder, and hypertension.

190.   Defendant Falcon told Plaintiff that he would receive BuSpar instead of Xanax.

191.   Every minimally competent professional working with prison inmates in a mental health capacity is aware that Xanax is highly addictive and, in particular, is notorious for its severe symptoms when a patient attempts to discontinue use of the drug – especially when a patient stops using the drug abruptly.

192.   The Federal Bureau of Prisons Clinical Practice Guidelines regarding "Detoxification of Chemically Dependent Inmates" states as follows, in relevant part (at Section 7, Benzodiazepine Withdrawal): "Benzodiazepine withdrawal syndrome can begin within a few hours of last drug use (especially when using short-acting drugs), but may take several weeks to

resolve. Because of the high risk of delirium, seizures, and death, benzodiazepine withdrawal should always be treated."

193.    The Federal Bureau of Prisons Clinical Practice Guidelines regarding "Detoxification of Chemically Dependent Inmates" includes information for prisoners facing benzodiazepine withdrawal, stating as follows, in relevant part (at Appendix 8: Patient Information – Detoxification from Benzodiazepines): "It is not safe to suddenly stop taking benzodiazepines. The symptoms of benzodiazepine withdrawal can include stomach upset, anxiety, mood swings, increased blood pressure, increased heart rate, insomnia, tremor, fever, loss of appetite, heavy sweating, hallucinations, seizures, and, in rare cases, death."

194.    According to the Federal Bureau of Prisons Clinical Practice Guidelines regarding "Detoxification of Chemically Dependent Inmates," Xanax has a half-life of only 6-15 hours.

195.    The medical insert for Xanax, published by its manufacturer, states as follows, in relevant part (in the section entitled "Dose Reduction"): Because of the danger of withdrawal, abrupt discontinuation of treatment should be avoided (see WARNINGS, PRECAUTIONS, DRUG ABUSE AND DEPENDENCE).  In all patients, dosage should be reduced gradually when discontinuing therapy or when decreasing the daily dosage."

196.    The New York State Commission of Corrections has explicitly noted that benzodiazepines can produce a dangerous withdrawal symptom which can be fatal if not treated appropriately and listed Xanax as a popular benzodiazepine.

197.    The New York State Commission of Corrections has stated that benzodiazepine medication should never be abruptly discontinued but can be tapered safely with proper monitoring.

198.    Every minimally competent professional working with prison inmates in a mental health capacity is aware that BuSpar, which is not a benzodiazepine, does not treat Benzodiazepine Withdrawal/Xanax Withdrawal (or withdrawal from any other benzodiazepine).

199.    Every minimally competent professional working with prison inmates in a mental health capacity is aware that Xanax has a short half-life.

200.    Defendant Falcon knew that Plaintiff was experiencing Benzodiazepine Withdrawal/Xanax Withdrawal.

201.    Defendant Falcon knew that BuSpar would not treat Plaintiff's Benzodiazepine Withdrawal/Xanax Withdrawal.

202.    The medical insert for BuSpar, published by its manufacturer, states as follows, in relevant part (in the section entitled "Potential for Withdrawal Reactions in Sedative/Hypnotic/Anxiolytic Drug-Dependent Patients"): "Because BuSpar does not exhibit cross-tolerance with benzodiazepines and other common sedative/hypnotic drugs, it will not block the withdrawal syndrome often seen with cessation of therapy with these drugs.  Therefore, before starting therapy with BuSpar, it is advisable to withdraw patients gradually, especially patients who have been using a CNS-depressant drug [such as Xanax] chronically, from their prior treatment."

203.    Plaintiff told Defendant Falcon that BuSpar would not help his Benzodiazepine Withdrawal/Xanax Withdrawal, but this was more than a simple disagreement between an inmate and doctor concerning the proper course of an inmate's medical treatment.  In this case, there was one proper course of treatment, suggested by Plaintiff, and one improper course of treatment, suggested by Defendant Falcon.

204.     Plaintiff begged Defendant Falcon to prescribe Xanax or another benzodiazepine to treat his withdrawal symptoms.

205.     Defendant Falcon told Plaintiff, "I'm sorry, but we're discouraged from prescribing those medications [Xanax or other benzodiazepines]."

206.     Defendant City of New York conveyed to Defendant Falcon that she was not to prescribe benzodiazepines.

207.     Defendant Corizon conveyed to Defendant Falcon that she was not to prescribe benzodiazepines.

208.     Defendant CMANY conveyed to Defendant Falcon that she was not to prescribe benzodiazepines.

209.     Defendant Team Health conveyed to Defendant Falcon that she was not to prescribe benzodiazepines.

210.     Personnel from Psychiatrists Only, LLC conveyed to Defendant Falcon that she was not to prescribe benzodiazepines.

211.     Plaintiff asked to be transferred to Bellevue, where he had received a very small dose of Klonopin while in NYPD custody and had been assured that he would be brought back every twelve hours.

212.     Defendant Falcon then told Plaintiff that even if Xanax (or any other benzodiazepine) was available and prescribed, he would not receive it until the pharmacist came in on Monday – approximately 60 hours later and just under 100 hours after he had last taken Xanax.

213.     Defendant Falcon knew that by Monday morning, Plaintiff would have been without Xanax for over 96 hours.

214.    Defendant Falcon had the discretion to treat Plaintiff with Xanax or another benzodiazepine.

215.    Defendant Falcon had the discretion to send Plaintiff an off-site medical facility for treatment.

216.    Defendant Falcon made the following decisions, among others, which evince an attitude of indifference to Plaintiff's serious medical needs:

> a.    Not to treat Plaintiff's serious injuries (and the probability of even more serious injuries) by refusing to send him to another on-site facility to receive any medication (including, but not limited to, Xanax or another benzodiazepine);

> b.    Not to treat Plaintiff's serious injuries (and the probability of even more serious injuries) by refusing to send him to off-site facility, such as Bellevue Hospital, where had previously received treatment, to receive any medication (including, but not limited to, Xanax or another benzodiazepine);

> c.    Not to treat Plaintiff's serious injuries (and the probability of even more serious injuries) by sending him back to the Manhattan Detention Complex, which did not even house Xanax (or another benzodiazepine);

> d.    Not to treat Plaintiff's serious injuries (and the probability of even more serious injuries) by sending him back to the Manhattan Detention Complex, where there was no pharmacist on duty (to fill any prescription) and would not be a pharmacist on duty for days;

e.      Not to treat Plaintiff's serious injuries by prescribing BuSpar, which was known to be an ineffective treatment of Benzodiazepine Withdrawal, including, but not limited to, Xanax Withdrawal;

f.      Not to treat Plaintiff's serious injuries by prescribing a very small dosage of BuSpar, which was known to be an ineffective treatment of Benzodiazepine Withdrawal, including, but not limited to, Xanax Withdrawal; and

g.      Not to treat Plaintiff's serious injuries (and the probability of even more serious injuries) by sending him to the Manhattan Detention Complex, where Plaintiff would not receive any medication for another 60 hours.

217.    Defendant Corizon, Defendant CMANY, and Defendant City of New York explicitly discourage the use of benzodiazepines in the treatment of any illnesses aside from alcohol withdrawal and opiate withdrawal.

218.    Medical staff at Rikers Island will not prescribe benzodiazepines unless a prisoner states that he or she is suicidal, homicidal, or claims dependence on alcohol or opiates.

219.    Plaintiff was placed back in "The Bubble," where he began to have panic attacks.

220.    Plaintiff saw Defendant Falcon through the glass and tried to get her attention.

221.    Defendant Falcon literally put her hands over her ears and ran off to avoid Plaintiff.

222.    Defendant Falcon knew about the dangers of seizures resulting from the abrupt stoppage of Xanax.

223.    Plaintiff had already gone into Benzodiazepine Withdrawal/Xanax Withdrawal.

224.    Defendant Noel had the discretion to refer Plaintiff to an outside facility to treat Plaintiff's Benzodiazepine Withdrawal/Xanax Withdrawal.

225.    Defendant Falcon had the discretion to refer Plaintiff to an outside facility to treat Plaintiff's Benzodiazepine Withdrawal/Xanax Withdrawal.

226.    Defendant Walker had the discretion to refer Plaintiff to an outside facility to treat Plaintiff's Benzodiazepine Withdrawal/Xanax Withdrawal.

227.    Defendant Noel knew that BuSpar would not help with Plaintiff's Benzodiazepine Withdrawal/Xanax Withdrawal.

228.    Defendant Falcon knew that BuSpar would not help with Plaintiff's Benzodiazepine Withdrawal/Xanax Withdrawal.

229.    Defendant Corizon requires its medical personnel to familiarize themselves with the medical inserts of popular drugs used to treat mental disorders, including, but not limited to, BuSpar and Xanax.

230.    Defendant Corizon trains its employees to understand and recognize symptoms of withdrawal from alcohol.

231.    Defendant Corizon trains its employees to understand and recognize symptoms of withdrawal from opiates.

232.    Defendant Corizon does not train its employees to understand and recognize symptoms of withdrawal from drugs of any kind other than alcohol and opiates.

233.    Defendant Falcon did not administer any medication – not even the BuSpar – to Plaintiff before leaving Rikers Island.

234.    Plaintiff was sent back to "The Bubble" with another man, who told him that he had faked a suicide attempt to get into the psychiatric facility.

235.    When NYCDOC personnel came to bring Plaintiff back to the Manhattan Detention Complex, one of the NYCDOC personnel told Plaintiff, "This is jail.  You need to know how to play the game."

236.    Unfortunately for Plaintiff, he did not know how to "play the game."

237.    Plaintiff was placed back in the General Population at the Manhattan Detention Complex.

238.    Just a few hours later, at approximately 8:00 a.m., Plaintiff went back to see Defendant Noel, who told him that the medications prescribed by Defendant Falcon would not be available until the following Monday, in part because the pharmacists were out for the weekend.

239.    At this point, Plaintiff was experiencing Benzodiazepine Withdrawal/Xanax Withdrawal but could not even receive the prescribed medications.

240.    Defendant Noel's suggestion to Plaintiff was to relax.

241.    Defendant Noel secured Plaintiff's transfer to a cell block in a housing unit, a less stressful environment.

242.    Plaintiff arrived at the cell block sometime on Saturday afternoon – almost 60 hours since he had last taken the Medication.

243.    NYCDOC personnel called multiple times for inmates to receive medication and insulin, but Plaintiff never received the medications prescribed by Defendant Falcon.

244.    NYCDOC personnel called multiple times for inmates to receive medication and insulin, but Plaintiff never received the insulin prescribed by Defendant Walker just after Plaintiff's intake the previous day.

245.   Plaintiff could not sleep on Saturday night and had psychotic episodes, including hallucinations (hearing things that were not there) and periods of hyperventilation and panic.

246.   Plaintiff turned his light on in an attempt to alleviate his symptoms.

247.   Some NYCDOC correctional officers came to Plaintiff's cell and asked him what his problem was.

248.   Plaintiff told the NYCDOC correctional officers that he could not breathe and had not gotten his medications.

249.   One of the NYCDOC correctional officers sent Plaintiff back to the medical unit within the Manhattan Detention Complex.

***Sunday, June 10, 2012***

250.   Plaintiff recalls there being a loud fan in the medical unit within the Manhattan Detention Complex and asking to be moved because he was hearing things.

251.   One of Medical Staff Defendants told Plaintiff that he had to stay where he was.

252.   Plaintiff told every medical staff member he could find in the medical unit within the Manhattan Detention Complex – Defendant MDC Medical Staff – that he was having withdrawal symptoms and had not received the medication prescribed by Defendant Falcon approximately 48 hours earlier.

253.   Plaintiff told every medical staff member he could find in the medical unit within the Manhattan Detention Complex – Defendant MDC Medical Staff – that he had not taken the Medication for over 72 hours.

254.   Plaintiff told every medical staff member he could find in the medical unit within the Manhattan Detention Complex – Defendant MDC Medical Staff – that he was hallucinating.

255.    Certain of Defendant MDC Medical Staff told Plaintiff the same thing he had heard over and over – that the facility did not have any medication to help with Benzodiazepine Withdrawal/Xanax Withdrawal and, even if there was, the medications would not be available until Monday.

256.    Defendant MDC Medical Staff's medical advice to Plaintiff was merely to relax.

257.    Plaintiff was not sent back to Rikers Island even after telling Defendant MDC Medical Staff that he was hallucinating, which is a state of psychosis.

258.    According to medical records, Plaintiff received Zoloft, which is an anti-depressant, not a benzodiazepine.

259.    According to medical records, Plaintiff received Zoloft, which is an anti-depressant, not a medication for psychosis.

260.    The medication order for the Zoloft was approved by Defendant Grandoit because this was an emergency.

261.    The medication order for the Zoloft was approved by Defendant Grandoit because there was no pharmacist on duty.

262.    Defendant Grandoit knew that he should give Plaintiff a different medication for psychosis.

263.    Defendant Grandoit knew that he should send Plaintiff back to the psychiatrists at Rikers Island for proper treatment.

264.    Defendant Grandoit knew that he should send someone experiencing hallucinations to the psychiatrists at Rikers Island.

265.    Defendant Grandoit knew that he was not giving Plaintiff the medication prescribed by the psychiatrist.

266.    Defendant Grandoit sent Plaintiff back to his jail cell.

267.    Defendant Grandoit knew that his actions put Plaintiff at a significant risk of (even more) serious injuries.

268.    Defendant Grandoit took all of these actions because of (*de facto* or written) policies and procedures implemented by Defendant City of New York.

269.    Defendant Grandoit took all of these actions because of (*de facto* or written) policies and procedures implemented by Defendant Corizon.

270.    Defendant Grandoit took all of these actions because of (*de facto* or written) policies and procedures implemented by Defendant CMANY.

271.    Plaintiff did not receive BuSpar because that medication was not available to the medical staff at the Manhattan Detention Complex at that time.

272.    Defendant MDC Medical Staff's assessment was that Plaintiff had a bipolar disorder, panic disorder, and an unspecified mood disorder.

273.    Plaintiff was sent back to his cell where he stayed in a state of psychosis for the rest of his stay at the Manhattan Detention Complex.

274.    Plaintiff had a scheduled visit with his wife later on Sunday morning – now over 72 hours since he had last taken the Medication.

275.    On Sunday morning, Plaintiff met with his wife in the Manhattan Detention Complex's medical visiting area.

276.    Plaintiff's wife told Defendant MDC Medical Staff that Plaintiff was in need of his Medication, including Xanax.

277.    Plaintiff's wife told him that she had procured his bail and he would be going home soon.

278.     A short time into his conversation with his wife, Plaintiff had a seizure and fell to the floor.

279.     Upon information and belief, Plaintiff's seizure was caught on camera and that video footage is in the possession of the NYCDOC (and thus in the possession of Defendant City of New York).

280.     Plaintiff sustained the following injuries as a result of the fall: a fractured skull, fractured sinuses, a concussion, permanent brain damage (decrease in cognitive functioning and memory loss), a permanent scar from his fall to the floor, post-concussion syndrome, post-traumatic stress disorder, and an exacerbation of his mental disorders.

281.     A doctor at the Manhattan Detention Complex memorialized Plaintiff's injury as a grand mal seizure.

282.     The doctor noted that Plaintiff had a laceration measuring five centimeters near his eye with extensive bleeding.

283.     The doctor noted that Plaintiff's speech was soft and slurred.

284.     Plaintiff was taken by ambulance to New York Downtown Hospital.

### *Sunday, June 10, 2012 – Monday, June 18, 2012*

285.     Plaintiff arrived at New York Downtown Hospital in the morning of Sunday, July 10, 2012, where he stayed for the next nine days (even though he was ordered to be released by a judge after five days).

286.     To treat his diabetes and Benzodiazepine Withdrawal/Xanax Withdrawal, Plaintiff received all of his proper medication – insulin and benzodiazepines.

287.    Plaintiff spent the entire first two days of his nine-day stay in the emergency room shackled to a gurney – by the wrist and the ankle – and unable to go to the bathroom, take a shower, or even walk around the room.

288.    Upon information and belief, there are records of another medical intake performed by Defendant Walker on Monday, June 11, 2012 – after Plaintiff had a seizure and chained to a gurney while he was at New York Downtown Hospital.

289.    Plaintiff did not communicate with Defendant Walker on Monday, June 11, 2012.

290.    After two days in the emergency room, doctors at New York Downtown Hospital insisted that Plaintiff be officially admitted to the hospital – that is, rolled from the emergency room into a hospital room.

291.    Plaintiff was admitted to New York Downtown Hospital over the protests of certain of the NYCDOC Defendants.

292.    At approximately 10:00 p.m. on Tuesday, June 12, 2012, staff at New York Downtown Hospital contacted a physician's assistant at MDC, who stated that they were not able to provide benzodiazepines there and to contact Riker's Island.

293.    The medical staff at New York Downtown Hospital contacted the NYCDOC/Corizon medical staff at MDC and Rikers Island several times throughout the week to ensure that Plaintiff would receive benzodiazepines if released.

294.    Upon information and belief, the NYCDOC/Corizon medical staff at MDC and Rikers Island repeatedly told the medical staff at New York Downtown Hospital that Plaintiff would not receive benzodiazepines if released.

295.     Upon information and belief, the medical staff at New York Downtown Hospital would not release Plaintiff into the custody of the NYCDOC/Corizon medical staff at MDC and Rikers Island because would not receive benzodiazepines if released.

296.     Plaintiff remained shackled to a hospital bed the following two days – by the wrist and the ankle – and unable to go to the bathroom, take a shower, or even walk around the room.

297.     Certain of the NYCDOC Defendants finally allowed Plaintiff to get up and shower in the middle of the week, after medical personnel protested continually.

298.     Certain of the NYCDOC Defendants ensured that Plaintiff remained shackled to a hospital bed for the following seven days – by the wrist and the ankle – and unable to go to the bathroom, take a shower, or even walk around the room.

299.     On Thursday, June 14, 2012, it was noted by staff at New York Downtown Hospital that "No correctional facility able to provide benzodiazepine currently."

300.     On Friday, June 15, 2012, the judge ordered Plaintiff to be released.

301.     Plaintiff's lawyers contacted the NYCDOC several times to inform them that the judge ordered Plaintiff to be released from NYCDOC custody.

302.     Plaintiff was not released from NYCDOC custody until Monday, June 18, 2012.

303.     Medical staff at New York Downtown Hospital would not allow the NYCDOC Defendants on duty to take Plaintiff to the Manhattan Detention Complex unless they would provide his medication or release him.

304.     The NYCDOC Defendants would not commit to providing this medication or releasing him, so Plaintiff stayed at New York Downtown Hospital.

305.     On Monday, June 18, 2012, certain of the NYCDOC Defendants were armed with batons and stun guns and went to New York Downtown Hospital to get Plaintiff.

306.    Certain of the NYCDOC Defendants pulled Plaintiff out of bed and threw him against a wall.  One of the NYCDOC Defendants, a black female, hit Plaintiff with a baton.

307.    Certain of the NYCDOC Defendants spoke to the doctor who had most vehemently opposed Plaintiff's transfer.

308.    Although Plaintiff does not know exactly what the NYCDOC Defendants told the doctor – upon information and belief, the NYCDOC Defendants implied that there was a conspiracy to keep Plaintiff out of jail – Plaintiff noticed that the doctor was in tears.

309.    The NYCDOC Defendants eventually coerced a hospital administrator into signing off on Plaintiff's transfer back to the Manhattan Detention Complex.

310.    Plaintiff was released from the Manhattan Detention Complex later that day – eleven days after his initial arrest.

311.    Since the incidents giving rise to this action, New York Downtown Hospital has improperly billed Plaintiff for tens of thousands of dollars for the care he received.

312.    This action falls within one or more of the exemptions set forth in CPLR §1602.

## DEMAND FOR JURY TRIAL

313.    Plaintiff demands a trial by jury.

**FIRST CLAIM FOR RELIEF**
**VIOLATION OF 42 U.S.C. 1983 – FALSE ARREST/FALSE IMPRISONMENT**
**As Against Defendant NYCDOC Holdover John Does**
**(including Defendant Stanley and Defendant Boyce)**

314.    Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 313, inclusive, as though fully set forth herein.

315.    Under the Fourth and Fourteenth Amendments of the Constitution of the United States of America and 42 U.S.C. 1983, Plaintiff has the right to be free from unreasonable and illegal searches and seizures, including false imprisonment and unlawful detention.

316.    Defendant NYCDOC Holdover John Does (including Defendant Stanley and Defendant Boyce) violated Plaintiff's rights when they intentionally confined Plaintiff, who was conscious at the time, without consent, justification, privilege, or probable cause after a judge ordered Plaintiff released from custody on Friday, June 15, 2012.

317.    The actions of Defendant NYCDOC Holdover John Does (including Defendant Stanley and Defendant Boyce) caused injuries to Plaintiff, including psychological injuries, emotional injuries, and loss of freedom, among other things.

318.    Defendant NYCDOC Holdover John Does (including Defendant Stanley and Defendant Boyce) took the aforementioned actions against Plaintiff during the course, and within the scope, of employment with the NYCDOC and Defendant City of New York.

319.    Defendant NYCDOC Holdover John Does (including Defendant Stanley and Defendant Boyce) were acting under color of state law at all times during the incidents giving rise to this action.

320.    The actions taken by Defendant NYCDOC Holdover John Does (including Defendant Stanley and Defendant Boyce) against Plaintiff were willful, wanton, reckless, and/or

malicious, and therefore entitle Plaintiff to punitive damages in an amount to be determined at trial.

## SECOND CLAIM FOR RELIEF
### VIOLATION OF 42 U.S.C. 1983
### DELIBERATE INDIFFERENCE TO MEDICAL NEEDS
### As Against Defendant Falcon, Defendant Noel, Defendant Walker, Defendant Grandoit, and Defendant MDC Medical Staff

321.    Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 320, inclusive, as though fully set forth herein.

322.    Defendant Falcon, Defendant Noel, Defendant Walker, Defendant Grandoit, and Defendant MDC Medical Staff each displayed a deliberate indifference to Plaintiff's medical needs in violation of the Eighth and Fourteenth Amendments of the Constitution and 42 U.S.C. 1983.

323.    Defendant Falcon, Defendant Noel, Defendant Walker, Defendant Grandoit, and Defendant MDC Medical Staff each knew of and disregarded the excessive risk to Plaintiff's health or safety on June 8-10, 2012.

324.    Defendant Falcon, Defendant Noel, Defendant Walker, Defendant Grandoit, and Defendant MDC Medical Staff were each aware of facts from which the inference could be drawn that a substantial risk of serious harm existed on June 8-10, 2012.

325.    Defendant Falcon, Defendant Noel, Defendant Walker, Defendant Grandoit, and Defendant MDC Medical Staff each drew an inference that Plaintiff would suffer serious medical problems if not given the proper care.

326.    Defendant Falcon, Defendant Noel, Defendant Walker, Defendant Grandoit, and Defendant MDC Medical Staff each displayed a conscious disregard of a substantial risk of serious harm to Plaintiff.

327.    Every minimally competent member of any medical staff at any correctional facility would have known that Plaintiff should have been treated for Benzodiazepine Withdrawal/Xanax Withdrawal.

328.    Every minimally competent member of any medical staff at any correctional facility would have known that Plaintiff should have been sent to psychiatrists or doctors when hallucinating.

329.    Plaintiff suffered serious injuries as a result of the (in)actions of Defendant Falcon, Defendant Noel, Defendant Walker, Defendant Grandoit, and Defendant MDC Medical Staff.

330.    Defendant Falcon, Defendant Noel, Defendant Walker, Defendant Grandoit, and Defendant MDC Medical Staff each displayed a conscious disregard of a substantial risk of serious harm to Plaintiff by not treating him.

331.    The actions of Defendant Falcon, Defendant Noel, Defendant Walker, Defendant Grandoit, and Defendant MDC Medical Staff caused injuries to Plaintiff, including physical injuries, psychological injuries, emotional injuries, loss of freedom, lost wages, and past and future medical expenses, among other things.

332.    Defendant Falcon, Defendant Noel, Defendant Walker, Defendant Grandoit, and Defendant MDC Medical Staff took the aforementioned actions against Plaintiff during the course, and within the scope, of employment with Defendant City of New York.

333.    Defendant Falcon, Defendant Noel, Defendant Walker, Defendant Grandoit, and Defendant MDC Medical Staff took the aforementioned actions against Plaintiff during the course, and within the scope, of employment with Defendant Corizon.

334.    Defendant Falcon, Defendant Noel, Defendant Walker, Defendant Grandoit, and Defendant MDC Medical Staff took the aforementioned actions against Plaintiff during the course, and within the scope, of employment with Defendant CMANY.

335.    Defendant Falcon took the aforementioned actions against Plaintiff during the course, and within the scope, of employment with Defendant Team Health.

336.    Defendant Falcon, Defendant Noel, Defendant Walker, Defendant Grandoit, and Defendant MDC Medical Staff were acting under color of state law during the incidents giving rise to this action.

337.    The actions taken by Defendant Falcon, Defendant Noel, Defendant Walker, Defendant Grandoit, and Defendant MDC Medical Staff against Plaintiff were willful, wanton, reckless, and/or malicious, and therefore entitle Plaintiff to punitive damages in an amount to be determined at trial.

### THIRD CLAIM FOR RELIEF
### VIOLATION OF 42 U.S.C. 1983 – CRUEL AND UNUSUAL PUNISHMENT
### As Against Defendant NYCDOC Shackling John Does (including Defendant Stanley)

338.    Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 337, inclusive, as though fully set forth herein.

339.    Under the Eighth and Fourteenth Amendments of the Constitution of the United States of America and 42 U.S.C. 1983, a prisoner or pretrial detainee has the right to be free from cruel and unusual punishment perpetuated by state actors.

340.    Defendant NYCDOC Shackling John Does (including Defendant Stanley) would not allow Plaintiff to be admitted to New York Downtown Hospital for two days after Plaintiff had a seizure.

341.    Defendant NYCDOC Shackling John Does (including Defendant Stanley) kept Plaintiff shackled to a gurney in the emergency room of New York Downtown Hospital for two days without allowing him to get up.

342.    Defendant NYCDOC Shackling John Does (including Defendant Stanley) only allowed Plaintiff to be admitted to New York Downtown Hospital upon the protests of hospital medical personnel.

343.    Once admitted to New York Downtown Hospital, Defendant NYCDOC Shackling John Does (including Defendant Stanley) kept Plaintiff shackled to a gurney for seven days, allowing him to get up only once.

344.    The actions of Defendant NYCDOC Shackling John Does (including Defendant Stanley) caused injuries to Plaintiff, including physical injuries, psychological injuries, emotional injuries, loss of freedom, lost wages, and past and future medical expenses, among other things.

345.    Defendant NYCDOC Shackling John Does (including Defendant Stanley) were acting under color of state law at all times during the incidents giving rise to this action.

346.    Defendant NYCDOC Shackling John Does (including Defendant Stanley) took the aforementioned actions against Plaintiff during the course, and within the scope, of employment with Defendant City of New York.

347.    The actions taken by Defendant NYCDOC Shackling John Does (including Defendant Stanley) against Plaintiff were willful, wanton, reckless, and/or malicious, and therefore entitle Plaintiff to punitive damages in an amount to be determined at trial.

**FOURTH CLAIM FOR RELIEF**
**VIOLATION OF 42 U.S.C. 1983 – USE OF EXCESSIVE FORCE**
**As Against Defendant NYCDOC Force John Does**
**(including Defendant Stanley and Defendant Boyce)**

348.    Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 347, inclusive, as though fully set forth herein.

349.    Plaintiff has the right, pursuant to the United States Constitution and the Fourth, Eighth, and Fourteenth Amendments thereto, to be free from brutal conduct and the application of undue or excessive force by those acting under color of state law.

350.    Defendant NYCDOC Force John Does (including Defendant Stanley and Defendant Boyce) violated Plaintiff's constitutional rights when they pushed Plaintiff into a wall and hit him with a baton upon letting Plaintiff out of the bed to which he had been shackled for nine days (with only one prior opportunities to get out of bed).

351.    Defendant NYCDOC Force John Does (including Defendant Stanley and Defendant Boyce) took these aforementioned actions against Plaintiff while acting under color of state law.

352.    Defendant NYCDOC Force John Does (including Defendant Stanley and Defendant Boyce) took these aforementioned actions against Plaintiff during the course, and within the scope, of their employment by the NYCDOC and Defendant City of New York.

353.    The actions of Defendant NYCDOC Force John Does (including Defendant Stanley and Defendant Boyce) caused injuries to Plaintiff, including physical injuries, psychological injuries, and past and future medical expenses, among other things.

354.    The actions taken by Defendant NYCDOC Force John Does (including Defendant Stanley and Defendant Boyce) against Plaintiff were willful, wanton, reckless, and/or malicious, and therefore entitle Plaintiff to punitive damages in an amount to be determined at trial.

## FIFTH CLAIM FOR RELIEF
## VIOLATION OF 42 U.S.C. 1983 – ILLEGAL SEARCH AND SEIZURE
### As Against Defendant Shabunia and Defendant NYPD Officers

355.     Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 354, inclusive, as though fully set forth herein.

356.     Under the Constitution of the United States of America and 42 U.S.C. 1983, Plaintiff has the right to be free from unreasonable and illegal searches and seizures.

357.     Defendant Shabunia and certain of Defendant NYPD Officers violated Plaintiff's rights when she/they intentionally took the Medication from Plaintiff's apartment without a warrant, consent, justification, privilege, or probable cause.

358.     The actions of Defendant Shabunia and certain of Defendant NYPD Officers caused injuries to Plaintiff, including physical injuries, psychological injuries, emotional injuries, loss of freedom, lost wages, and past and future medical expenses, among other things.

359.     Defendant Shabunia and certain of Defendant NYPD Officers took the aforementioned actions against Plaintiff during the course, and within the scope, of employment with the NYPD and Defendant City of New York.

360.     Defendant Shabunia and certain of Defendant NYPD Officers were acting under color of state law at all times during the incidents giving rise to this action.

361.     The actions taken by Defendant Shabunia and certain of Defendant NYPD Officers against Plaintiff were willful, wanton, reckless, and/or malicious, and therefore entitle Plaintiff to punitive damages in an amount to be determined at trial.

**SIXTH CLAIM FOR RELIEF**
**VIOLATION OF 42 U.S.C. 1983 – MUNICIPAL LIABILITY**
**As Against Defendant City of New York, Defendant Corizon, Defendant CMANY,**
**Defendant Schriro, and the Defendant Policymakers**

362.     Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 361, inclusive, as though fully set forth herein.

363.     Defendant City of New York owns and operates the Manhattan Detention Complex and/or Rikers Island through certain of its mayoral agencies, including, but not limited to, the NYCDOC.

364.     Defendant Corizon had a contract with Defendant City of New York to deliver a wide range of healthcare and pharmacy programs at Rikers Island and the Manhattan Detention Complex.

365.     Defendant CMANY had a contract with Defendant City of New York to deliver a wide range of healthcare and pharmacy programs at Rikers Island and the Manhattan Detention Complex.

366.     Defendant City of New York was acting under color of state law at the time of the incidents giving rise to this action.

367.     Defendant Corizon was acting under color of state law at the time of the incidents giving rise to this action.

368.     Defendant CMANY was acting under color of state law at the time of the incidents giving rise to this action.

369.     Defendant City of New York, Defendant CMANY, and/or Defendant Corizon engages in the following unconstitutional policies and practices with respect to prisoners and/or pretrial detainees at the Manhattan Detention Complex and/or Rikers Island:

a.     Medical staff, including, but not limited to, physicians, psychiatrists, psychologists, social workers, and/or physician's assistants, at the Manhattan Detention Complex and Rikers Island are unable to treat prisoners or pretrial detainees for benzodiazepine withdrawal in any meaningful way;

b.     Medical staff, including, but not limited to, physicians, psychiatrists, psychologists, social workers, and/or physician's assistants, at the Manhattan Detention Complex and Rikers Island are unable to treat prisoners or pretrial detainees for benzodiazepine withdrawal in any meaningful way because the facility does not even have the proper medication in its pharmacy;

c.     Medical staff, including, but not limited to, physicians, psychiatrists, psychologists, social workers, and/or physician's assistants, at the Manhattan Detention Complex and Rikers Island are unable to treat prisoners or pretrial detainees for benzodiazepine withdrawal (through the use of benzodiazepines) upon the request of an off-site hospital;

d.     Medical staff, including, but not limited to, physicians, psychiatrists, psychologists, social workers, and/or physician's assistants, at the Manhattan Detention Complex and Rikers Island are unable to treat prisoners or pretrial detainees for benzodiazepine withdrawal (through the use of benzodiazepines) upon the request of an off-site doctor/psychiatrist;

e.     Medical staff, including, but not limited to, physicians, psychiatrists, psychologists, social workers, and/or physician's assistants, at the

Manhattan Detention Complex and Rikers Island are unable to treat prisoners or pretrial detainees for benzodiazepine withdrawal (through the use of benzodiazepines) without a court order;

f.      Medical staff, including, but not limited to, physicians, psychiatrists, psychologists, social workers, and/or physician's assistants, at the Manhattan Detention Complex and Rikers Island are unable to treat prisoners or pretrial detainees with benzodiazepine withdrawal (through the use of benzodiazepines) pursuant to written policy promulgated by Defendant City of New York, Defendant CMANY, and/or Defendant Corizon;

g.      Medical staff, including, but not limited to, physicians, psychiatrists, psychologists, social workers, and/or physician's assistants, at the Manhattan Detention Complex and Rikers Island are unable to send prisoners or pretrial detainees to outside facilities/hospitals to treat benzodiazepine withdrawal (with benzodiazepines) pursuant to written policy promulgated by Defendant City of New York, Defendant CMANY, and/or Defendant Corizon;

h.      Medical staff, including, but not limited to, physicians, psychiatrists, psychologists, social workers, and/or physician's assistants, at the Manhattan Detention Complex and Rikers Island are unable to send prisoners or pretrial detainees to outside facilities/hospitals to treat benzodiazepine withdrawal (with benzodiazepines) pursuant to customs and practices so pervasive that it has the effect of written policy

(perpetuated by Defendant City of New York, Defendant CMANY, and/or Defendant Corizon);

i.     Medical staff, including, but not limited to, physicians, psychiatrists, psychologists, social workers, and/or physician's assistants, at the Manhattan Detention Complex and Rikers Island are unable to access prescribed medications without the approval of a pharmacist(s), who is/are not available on the weekends, pursuant to written policy promulgated by Defendant City of New York, Defendant CMANY, and/or Defendant Corizon;

j.     Medical staff, including, but not limited to, physicians, psychiatrists, psychologists, social workers, and/or physician's assistants, at the Manhattan Detention Complex and Rikers Island are unable to access prescribed medications without the approval of a pharmacist(s), who is/are not available on the weekends, pursuant to customs and practices so pervasive that it has the effect of written policy (perpetuated by Defendant City of New York, Defendant CMANY, and/or Defendant Corizon);

k.     Medical staff, including, but not limited to, physicians, psychiatrists, psychologists, social workers, and/or physician's assistants, at the Manhattan Detention Complex and Rikers Island are prohibited from diagnosing a prisoner or pretrial detainee with benzodiazepine withdrawal, pursuant to written policy promulgated by Defendant City of New York, Defendant CMANY, and/or Defendant Corizon;

l.      Medical staff, including, but not limited to, physicians, psychiatrists, psychologists, social workers, and/or physician's assistants, at the Manhattan Detention Complex and Rikers Island are prohibited from diagnosing a prisoner or pretrial detainee with benzodiazepine withdrawal, pursuant to customs and practices so pervasive that it has the effect of written policy (perpetuated by Defendant City of New York, Defendant CMANY, and/or Defendant Corizon);

m.      Medical staff, including, but not limited to, physicians, psychiatrists, psychologists, social workers, and/or physician's assistants, at the Manhattan Detention Complex and Rikers Island are prohibited from diagnosing a prisoner or pretrial detainee with any substance induced mood disorder except alcohol withdrawal and opiate withdrawal, pursuant to written policy promulgated by Defendant City of New York, Defendant CMANY, and/or Defendant Corizon;

n.      Medical staff, including, but not limited to, physicians, psychiatrists, psychologists, social workers, and/or physician's assistants, at the Manhattan Detention Complex and Rikers Island are prohibited from diagnosing a prisoner or pretrial detainee with any substance induced mood disorder except alcohol withdrawal and opiate withdrawal pursuant to customs and practices so pervasive that it has the effect of written policy (perpetuated by Defendant City of New York, Defendant CMANY, and/or Defendant Corizon); and

o.   Medical staff, including, but not limited to, physicians, psychiatrists, psychologists, social workers, and/or physician's assistants, at the Manhattan Detention Complex and Rikers Island are prohibited from administering benzodiazepines to treat active seizures, pursuant to written policy promulgated by Defendant City of New York, Defendant CMANY, and/or Defendant Corizon.

370.   Defendant City of New York, through its explicit policies and protocols, has shown a deliberate indifference towards prisoners, including pretrial detainees, with respect to the foregoing unconstitutional policies.

371.   Defendant Corizon, through its explicit policies and protocols, has shown a deliberate indifference towards prisoners, including pretrial detainees, with respect to the foregoing unconstitutional policies.

372.   Defendant CMANY, through its explicit policies and protocols, has shown a deliberate indifference towards prisoners, including pretrial detainees, with respect to the foregoing unconstitutional policies.

373.   Defendant City of New York, through customs or practices that are not written or formally adopted, but that are so pervasive as to have the effect of explicit policies or protocols, has shown a deliberate indifference towards prisoners, including pretrial detainees, with respect to the foregoing unconstitutional policies.

374.   Defendant Corizon, through customs or practices that are not written or formally adopted, but that are so pervasive as to have the effect of explicit policies or protocols, has shown a deliberate indifference towards prisoners, including pretrial detainees, with respect to the foregoing unconstitutional policies.

375.    Defendant CMANY, through customs or practices that are not written or formally adopted, but that are so pervasive as to have the effect of explicit policies or protocols, has shown a deliberate indifference towards prisoners, including pretrial detainees, with respect to the foregoing unconstitutional policies.

376.    The Medical Review Board of the New York State Commission of Corrections studied numerous incidents of benzodiazepine withdrawal, such as Benzodiazepine Withdrawal/Xanax Withdrawal, in this state within the past few years.

377.    Plaintiff cannot ascertain the identities of all prisoners and pretrial detainees who suffer(ed) serious injuries as a result of each of the foregoing unconstitutional explicit policies and protocols without discovery.

378.    Plaintiff cannot ascertain the exact number or identities of all prisoners and pretrial detainees who suffer(ed) serious injuries as a result of each of the foregoing unconstitutional explicit policies and protocols for one or more of the following reasons, among others: (1) some inmates, such as Plaintiff, are not detained long enough to file grievances; (2) inmates are discouraged from complaining vocally; (3) inmates are discouraged from filing official grievances; (4) some inmates are not aware that their serious injuries are the result of benzodiazepine withdrawal; (5) New York City jails have a policy of treating serious injuries (including seizures) internally, keeping inmates unaware of the cause of their serious medical injuries; and (6) medical staff knowingly fail to record many complaints of withdrawal.

379.    Defendant Schriro and the Defendant Policymakers are, and were at the time of the incidents giving rise to this action, personally aware of and complicit in promoting these unconstitutional policies.

380. Defendant Schriro and the Defendant Policymakers failed to change, modify, or even address the unconstitutional policies and procedures set forth above (to this date).

381. Plaintiff sustained serious injuries as a result of each of the foregoing unconstitutional explicit policies and protocols.

382. Plaintiff sustained serious injuries as a result of the foregoing unconstitutional customs or practices that are not written or formally adopted, but that are so pervasive as to have the effect of explicit policies and protocols.

## SEVENTH CLAIM FOR RELIEF
### VIOLATION OF 42 U.S.C. 1983 – MUNICIPAL LIABILITY (PROSPECTIVE RELIEF)
### As Against Defendant City of New York, Defendant Corizon, Defendant CMANY, Defendant Schriro, and Defendant Policymakers

383. Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 382, inclusive, as though fully set forth herein.

384. On January 16, 2013, the New York State Commission of Correction sent a memorandum to prison officials, including wardens in New York City correctional facilities, mandating that all facilities put into place special protocols to deal with withdrawal from benzodiazepines (such as Xanax).

385. The New York State Commission of Correction sent out this memorandum after careful studies of several cases of withdrawal from benzodiazepines (such as Xanax) in jails and prisons across the state.

386. The NYCDOC has put into place special protocols to deal with alcohol withdrawal and opiate withdrawal in its jails, including, but not limited to, Rikers Island and the Manhattan Detention Complex.

387. To date, Defendant City of New York, Defendant Corizon, Defendant CMANY, Defendant Schriro, and the Defendant Policymakers have not implemented any special protocols

to deal with withdrawal from benzodiazepines (such as Xanax) in its jails, including, but not limited to, Rikers Island and the Manhattan Detention Complex.

388.   To date, Defendant City of New York, Defendant Corizon, Defendant CMANY, Defendant Schriro, and the Defendant Policymakers have not taken any steps to put into place any special protocols to deal with withdrawal from benzodiazepines (such as Xanax) in its jails, including, but not limited to, Rikers Island and the Manhattan Detention Complex.

389.   Prisoners and/or pretrial detainees at NYCDOC facilities continue to suffer from withdrawal from benzodiazepines (such as Xanax) in its jails, including, but not limited to, Rikers Island and the Manhattan Detention Complex, with no end in sight.

390.   Plaintiff demands that Defendant City of New York, Defendant Corizon, Defendant CMANY, Defendant Schriro, and the Defendant Policymakers promulgate adequate protocols to deal with withdrawal from benzodiazepines (such as Xanax) in its jails, including, but not limited to, Rikers Island and the Manhattan Detention Complex, in accordance with the mandate of the New York State Commission of Corrections and every inmate's constitutional rights.

391.   The failure of Defendant City of New York, Defendant Corizon, Defendant CMANY, Defendant Schriro, and the Defendant Policymakers to implement adequate protocols to deal with withdrawal from benzodiazepines (such as Xanax) in its jails, including, but not limited to, Rikers Island and the Manhattan Detention Complex, evidences both a violation of the Constitution of the United States of America and the federal civil rights laws through a deliberate indifference to these inmates' medical needs.

392.   Plaintiff sustained serious injuries which would have been prevented had there been adequate protocols to deal with withdrawal from benzodiazepines (such as Xanax) in New

York City jails, including, but not limited to, Rikers Island and the Manhattan Detention Complex

393.    Plaintiff seeks prospective relief to ensure that the NYCDOC implements adequate protocols to deal with withdrawal from benzodiazepines (such as Xanax) in its jails, including, but not limited to, Rikers Island and the Manhattan Detention Complex.

394.    Plaintiff seeks systemic equitable reform to the NYCDOC's policies and protocols regarding the treatment of prisoner and detainees suffering from withdrawal from benzodiazepines (such as Xanax) in its jails, including, but not limited to, Rikers Island and the Manhattan Detention Complex.

395.    Defendant City of New York, Defendant Corizon, Defendant CMANY, Defendant Schriro, and the Defendant Policymakers have a history of changing policies and procedures only after the filing of a highly publicized lawsuit or court order.

<u>EIGHTH CLAIM FOR RELIEF</u>
**VIOLATION OF 42 U.S.C. 1983 – FAILURE TO INTERVENE**
**As Against Defendant Grandoit, Defendant Walker, Defendant Noel,**
**Defendant NYCDOC Holdover John Does, Defendant MDC Medical Staff,**
**Defendant NYCDOC Shackling John Does, Defendant Stanley, Defendant Boyce, and**
**Defendant NYPD Officers**

396.    Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 395, inclusive, as though fully set forth herein.

397.    Under the Constitution of the United States of America and 42 U.S.C. 1983, state actors have an affirmative duty to protect the constitutional rights of citizens by intervening when other state actors commit constitutional violations in their presence.

398.    On June 15-18, 2012, certain of Defendant NYCDOC Holdover John Does (including Defendant Stanley) violated Plaintiff's constitutional rights when, in his/her/their

presence, Defendant NYCDOC Holdover John Does unlawfully imprisoned Plaintiff, yet did not intervene to protect Plaintiff.

399.    On June 8-10, 2012, Defendant Grandoit, Defendant Walker, Defendant Noel, and Defendant MDC Medical Staff violated Plaintiff's constitutional rights when, in their presence, certain of the individual defendants displayed a deliberate indifference to Plaintiff's medical needs, yet did not intervene to protect Plaintiff.

400.    On June 10-12, 2012, Defendant Stanley violated Plaintiff's constitutional rights when, in his/her presence, Defendant NYCDOC Shackling John Does demonstrated cruel and unusual punishment towards Plaintiff, yet did not intervene to protect Plaintiff.

401.    On June 18, 2012, Defendant Stanley and Defendant Boyce violated Plaintiff's constitutional rights when, in their presence, one or more of Defendant NYCDOC Force John Does used excessive force against Plaintiff, yet did not intervene to protect Plaintiff.

402.    On June 7, 2012, Defendant NYPD Officers violated Plaintiff's constitutional rights when, in his/her/their presence, Defendant Shabunia illegally seized Plaintiff's medication, yet did not intervene to protect Plaintiff.

403.    The (in)actions of the aforementioned Defendants caused injuries to Plaintiff, including physical injuries, psychological injuries, emotional injuries, loss of freedom, lost wages, and past and future medical expenses, among other things.

404.    The aforementioned Defendants took the aforementioned (in)actions against Plaintiff during the course, and within the scope, of employment with Defendant City of New York.

405.    The aforementioned Defendants took the aforementioned (in)actions against Plaintiff during the course, and within the scope, of employment with Defendant Corizon.

406.    The aforementioned Defendants took the aforementioned (in)actions against Plaintiff during the course, and within the scope, of employment with Defendant CMANY.

407.    The (in)actions taken by the aforementioned Defendants against Plaintiff were willful, wanton, reckless, and/or malicious, and therefore entitle Plaintiff to punitive damages in an amount to be determined at trial.

**NINTH CLAIM FOR RELIEF**
**FALSE ARREST/FALSE IMPRISONMENT**
**As Against Defendant City of New York and Defendant NYCDOC Holdover John Does**
**(including Defendant Stanley and Defendant Boyce)**

408.    Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 407, inclusive, as though fully set forth herein.

409.    Defendant NYCDOC Holdover John Does (including Defendant Stanley and Defendant Boyce) did not have probable cause or other justification to imprison and confine Plaintiff, who was conscious during this time.

410.    Plaintiff did not consent to the aforementioned imprisonment and confinement by Defendant NYCDOC Holdover John Does (including Defendant Stanley and Defendant Boyce) on June 15-18, 2012.

411.    The actions of Defendant NYCDOC Holdover John Does (including Defendant Stanley and Defendant Boyce) caused injuries to Plaintiff, including physical injuries, psychological injuries, emotional injuries, loss of freedom, lost wages, and past and future medical expenses, among other things.

412.    Defendant NYCDOC Holdover John Does (including Defendant Stanley and Defendant Boyce) took the aforementioned actions against Plaintiff during the course, and within the scope, of employment with Defendant City of New York.

413.     Defendant City of New York is liable for the acts of its agents/employees, including Defendant NYCDOC Holdover John Does (including Defendant Stanley and Defendant Boyce), taken against Plaintiff during the course, and within the scope, of employment by Defendant City of New York under the doctrine of *respondeat superior*.

414.     The actions taken by Defendant NYCDOC Holdover John Does (including Defendant Stanley and Defendant Boyce) against Plaintiff were willful, wanton, reckless, and/or malicious, and therefore entitle Plaintiff to punitive damages in an amount to be determined at trial.

## TENTH CLAIM FOR RELIEF
### ASSAULT
### As Against Defendant City of New York and Defendant NYCDOC Force John Does
### (including Defendant Stanley and Defendant Boyce)

415.     Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 414, inclusive, as though fully set forth herein.

416.     Defendant NYCDOC Force John Does (including Defendant Stanley and Defendant Boyce) intentionally placed Plaintiff in apprehension of imminent harmful, offensive conduct, and unwanted contact, without justification or privilege.

417.     The actions of Defendant NYCDOC Force John Does (including Defendant Stanley and Defendant Boyce) caused injuries to Plaintiff, including physical injuries, psychological injuries, emotional injuries, loss of freedom, lost wages, and past and future medical expenses, among other things.

418.     Defendant NYCDOC Force John Does (including Defendant Stanley and Defendant Boyce) took the aforementioned actions against Plaintiff during the course, and within the scope, of employment with Defendant City of New York.

419.    Defendant City of New York is liable for the acts of its agents/employees, including Defendant NYCDOC Force John Does (including Defendant Stanley and Defendant Boyce), taken against Plaintiff during the course, and within the scope, of employment by Defendant City of New York under the doctrine of *respondeat superior*.

420.    The aforementioned actions taken by Defendant NYCDOC Force John Does (including Defendant Stanley and Defendant Boyce) against Plaintiff were willful, wanton, reckless, and/or malicious, and therefore entitle Plaintiff to punitive damages in an amount to be determined at trial.

<u>**ELEVENTH CLAIM FOR RELIEF**</u>
**BATTERY**
**As Against Defendant City of New York and Defendeat NYCDOC Force John Does**
**(including Defendant Stanley and Defendant Boyce)**

421.    Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 420, inclusive, as though fully set forth herein.

422.    Defendant NYCDOC Force John Does (including Defendant Stanley and Defendant Boyce) intentionally initiated wrongful and excessive physical contact with Plaintiff without Plaintiff's consent.

423.    The actions of Defendant NYCDOC Force John Does (including Defendant Stanley and Defendant Boyce) caused injuries to Plaintiff, including physical injuries, psychological injuries, emotional injuries, loss of freedom, lost wages, and past and future medical expenses, among other things.

424.    Defendant NYCDOC Force John Does (including Defendant Stanley and Defendant Boyce) took the aforementioned actions against Plaintiff during the course, and within the scope, of employment with Defendant City of New York.

425.     Defendant City of New York is liable for the acts of its agents/employees, including Defendant NYCDOC Force John Does (including Defendant Stanley and Defendant Boyce), taken against Plaintiff during the course, and within the scope, of employment by Defendant City of New York under the doctrine of *respondeat superior*.

426.     The aforementioned actions taken by Defendant NYCDOC Force John Does (including Defendant Stanley and Defendant Boyce) against Plaintiff were willful, wanton, reckless, and/or malicious, and therefore entitle Plaintiff to punitive damages in an amount to be determined at trial.

**TWELFTH CLAIM FOR RELIEF**
**NEGLIGENT HIRING, SUPERVISION, AND RETENTION**
**As Against Defendant City of New York**

427.     Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 426, inclusive, as though fully set forth herein.

428.     Defendant City of New York has, and had at the time of the incidents giving rise to this action, a duty to adequately screen candidates for employment in its psychiatric/medical facilities to ensure their competency.

429.     Defendant City of New York has, and had at the time of the incidents giving rise to this action, a duty to adequately screen candidates for employment in its psychiatric/medical facilities to ensure their familiarity with psychiatric disorders and the medications used to treat them.

430.     Defendant City of New York has, and had at the time of the incidents giving rise to this action, a duty to adequately screen candidates for employment in its psychiatric/medical facilities to ensure their familiarity with withdrawal from medications, such as benzodiazepines (and Xanax), and the medications used to treat withdrawal.

431.     Defendant City of New York has, and had at the time of the incidents giving rise to this action, a duty to train and supervise its employees, including Defendants, with respect to the recognition of withdrawal symptoms from psychiatric medications, such as benzodiazepines (and Xanax).

432.     Defendant City of New York has, and had at the time of the incidents giving rise to this action, a duty to train and supervise its employees, including Defendants, with respect to the treatment of withdrawal symptoms from psychiatric medications, such as benzodiazepines (and Xanax).

433.     Defendant City of New York has, and had at the time of the incidents giving rise to this action, a duty to train and supervise its employees, including Defendants, with respect to the dangers of Benzodiazepine Withdrawal/Xanax Withdrawal.

434.     Defendant City of New York has, and had at the time of the incidents giving rise to this action, a duty to train and supervise its employees, including Defendants, with respect to the proper use and half-life of oft-prescribed psychiatric drugs, such as benzodiazepines (such as Xanax) and others (such as BuSpar).

435.     Defendant City of New York has, and had at the time of the incidents giving rise to this action, a duty to train and supervise its employees, including Defendants, in the proper way to treat withdrawal from benzodiazepines (such as Xanax).

436.     Defendant City of New York has, and had at the time of the incidents giving rise to this action, a duty to train and supervise its employees, including Defendants, to send a prisoner/detainee to a facility for proper treatment if proper treatment cannot be provided at the present facility.

437.    Defendant City of New York has, and had at the time of the incidents giving rise to this action, a duty to train and supervise its employees, including Defendants, to prescribe medications that are available to a prisoner/detainee.

438.    Defendant City of New York has, and had at the time of the incidents giving rise to this action, a duty to train and supervise its employees, including Defendants, to distribute medications prescribed by a psychiatrist for a prisoner/detainee.

439.    Defendant City of New York breached its aforementioned duties.

440.    Plaintiff sustained injuries as a result of the breaches of the aforementioned duties of Defendant City of New York (and Defendants), including physical injuries, psychological injuries, emotional injuries, loss of freedom, and past and future medical expenses, among other things.

441.    Defendant City of New York is liable for the acts of its agents/employees, including Defendants, taken against Plaintiff during the course, and within the scope, of employment by Defendant City of New York under the doctrine of *respondeat superior*.

**THIRTEENTH CLAIM FOR RELIEF**
**NEGLIGENT HIRING, SUPERVISION, AND RETENTION**
**As Against Defendant Corizon**

442.    Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 441, inclusive, as though fully set forth herein.

443.    Defendant Corizon has, and had at the time of the incidents giving rise to this action, a duty to adequately screen candidates for employment in its psychiatric/medical facilities to ensure their competency.

444.    Defendant Corizon has, and had at the time of the incidents giving rise to this action, a duty to adequately screen candidates for employment in its psychiatric/medical facilities to ensure their familiarity with psychiatric disorders and the medications used to treat them.

445.    Defendant Corizon has, and had at the time of the incidents giving rise to this action, a duty to adequately screen candidates for employment in its psychiatric/medical facilities to ensure their familiarity with withdrawal from medications, such as benzodiazepines (and Xanax), and the medications used to treat withdrawal.

446.    Defendant Corizon has, and had at the time of the incidents giving rise to this action, a duty to train and supervise its employees, including Defendants, with respect to the recognition of withdrawal symptoms from psychiatric medications, such as benzodiazepines (and Xanax).

447.    Defendant Corizon has, and had at the time of the incidents giving rise to this action, a duty to train and supervise its employees, including Defendants, with respect to the treatment of withdrawal symptoms from psychiatric medications, such as benzodiazepines (and Xanax).

448.    Defendant Corizon has, and had at the time of the incidents giving rise to this action, a duty to train and supervise its employees, including Defendants, with respect to the dangers of Benzodiazepine Withdrawal/Xanax Withdrawal.

449.    Defendant Corizon has, and had at the time of the incidents giving rise to this action, a duty to train and supervise its employees, including Defendants, with respect to the proper use and half-life of oft-prescribed psychiatric drugs, such as benzodiazepines (such as Xanax) and others (such as BuSpar).

450.     Defendant Corizon has, and had at the time of the incidents giving rise to this action, a duty to train and supervise its employees, including Defendants, in the proper way to treat withdrawal from benzodiazepines (such as Xanax).

451.     Defendant Corizon has, and had at the time of the incidents giving rise to this action, a duty to train and supervise its employees, including Defendants, to send a prisoner/detainee/prisoner to a facility for proper treatment if proper treatment cannot be provided at the present facility.

452.     Defendant Corizon has, and had at the time of the incidents giving rise to this action, a duty to train and supervise its employees, including Defendants, to prescribe medications that are available to a prisoner/detainee.

453.     Defendant Corizon has, and had at the time of the incidents giving rise to this action, a duty to train and supervise its employees, including Defendants, to distribute medications prescribed by a psychiatrist for a prisoner/detainee.

454.     Defendant Corizon breached its aforementioned duties.

455.     Plaintiff sustained injuries as a result of the breaches of the aforementioned duties of Defendant Corizon (and Defendant Falcon, Defendant Grandoit, Defendant Walker, Defendant Noel, and Defendant MDC Medical Staff), including physical injuries, psychological injuries, emotional injuries, loss of freedom, lost wages, and past and future medical expenses, among other things.

456.     Defendant Corizon is liable for the acts of its agents/employees, including Defendant Falcon, Defendant Grandoit, Defendant Walker, Defendant Noel, and Defendant MDC Medical Staff, taken against Plaintiff during the course, and within the scope, of employment by Defendant Corizon under the doctrine of *respondeat superior*.

**FOURTEENTH CLAIM FOR RELIEF**
**NEGLIGENT HIRING, SUPERVISION, AND RETENTION**
**As Against Defendant CMANY**

457.    Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 456, inclusive, as though fully set forth herein.

458.    Defendant CMANY has, and had at the time of the incidents giving rise to this action, a duty to adequately screen candidates for employment in its psychiatric/medical facilities to ensure their competency.

459.    Defendant CMANY has, and had at the time of the incidents giving rise to this action, a duty to adequately screen candidates for employment in its psychiatric/medical facilities to ensure their familiarity with psychiatric disorders and the medications used to treat them.

460.    Defendant CMANY has, and had at the time of the incidents giving rise to this action, a duty to adequately screen candidates for employment in its psychiatric/medical facilities to ensure their familiarity with withdrawal from medications, such as benzodiazepines (and Xanax), and the medications used to treat withdrawal.

461.    Defendant CMANY has, and had at the time of the incidents giving rise to this action, a duty to train and supervise its employees, including Defendants, with respect to the recognition of withdrawal symptoms from psychiatric medications, such as benzodiazepines (and Xanax).

462.    Defendant CMANY has, and had at the time of the incidents giving rise to this action, a duty to train and supervise its employees, including Defendants, with respect to the treatment of withdrawal symptoms from psychiatric medications, such as benzodiazepines (and Xanax).

463.    Defendant CMANY has, and had at the time of the incidents giving rise to this action, a duty to train and supervise its employees, including Defendants, with respect to the dangers of Benzodiazepine Withdrawal/Xanax Withdrawal.

464.    Defendant CMANY has, and had at the time of the incidents giving rise to this action, a duty to train and supervise its employees, including Defendants, with respect to the proper use and half-life of oft-prescribed psychiatric drugs, such as benzodiazepines (such as Xanax) and others (such as BuSpar).

465.    Defendant CMANY has, and had at the time of the incidents giving rise to this action, a duty to train and supervise its employees, including Defendants, in the proper way to treat withdrawal from benzodiazepines (such as Xanax).

466.    Defendant CMANY has, and had at the time of the incidents giving rise to this action, a duty to train and supervise its employees, including Defendants, to send a prisoner/detainee/prisoner to a facility for proper treatment if proper treatment cannot be provided at the present facility.

467.    Defendant CMANY has, and had at the time of the incidents giving rise to this action, a duty to train and supervise its employees, including Defendants, to prescribe medications that are available to a prisoner/detainee.

468.    Defendant CMANY has, and had at the time of the incidents giving rise to this action, a duty to train and supervise its employees, including Defendants, to distribute medications prescribed by a psychiatrist for a prisoner/detainee.

469.    Defendant CMANY breached its aforementioned duties.

470.    Plaintiff sustained injuries as a result of the breaches of the aforementioned duties of Defendant CMANY (and Defendant Falcon, Defendant Grandoit, Defendant Walker,

Defendant Noel, and Defendant MDC Medical Staff), including physical injuries, psychological injuries, emotional injuries, loss of freedom, lost wages, and past and future medical expenses, among other things.

471.    Defendant CMANY is liable for the acts of its agents/employees, including Defendant Falcon, Defendant Grandoit, Defendant Walker, Defendant Noel, and Defendant MDC Medical Staff, taken against Plaintiff during the course, and within the scope, of employment by Defendant CMANY under the doctrine of *respondeat superior*.

**FIFTEENTH CLAIM FOR RELIEF**
**NEGLIGENT HIRING, SUPERVISION, AND RETENTION**
**As Against Defendant Team Health**

472.    Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 471, inclusive, as though fully set forth herein.

473.    Defendant Team Health has, and had at the time of the incidents giving rise to this action, a duty to adequately screen candidates for employment.

474.    Defendant Team Health has, and had at the time of the incidents giving rise to this action, a duty to adequately screen candidates for employment, including Defendant Falcon, to ensure their familiarity with psychiatric disorders and the medications used to treat them.

475.    Defendant Team Health has, and had at the time of the incidents giving rise to this action, a duty to adequately screen candidates for employment, including Defendant Falcon,  to ensure their familiarity with withdrawal from medications, such as benzodiazepines (and Xanax), and the medications used to treat withdrawal.

476.    Defendant Team Health has, and had at the time of the incidents giving rise to this action, a duty to train and supervise its employees, including Defendant Falcon, with respect to

the recognition of withdrawal symptoms from psychiatric medications, such as benzodiazepines (and Xanax).

477.     Defendant Team Health has, and had at the time of the incidents giving rise to this action, a duty to train and supervise its employees, including Defendant Falcon, with respect to the treatment of withdrawal symptoms from psychiatric medications, such as benzodiazepines (and Xanax).

478.     Defendant Team Health has, and had at the time of the incidents giving rise to this action, a duty to train and supervise its employees, including Defendant Falcon, with respect to the dangers of Benzodiazepine Withdrawal/Xanax Withdrawal.

479.     Defendant Team Health has, and had at the time of the incidents giving rise to this action, a duty to train and supervise its employees, including Defendant Falcon, with respect to the proper use and half-life of oft-prescribed psychiatric drugs, such as benzodiazepines (such as Xanax) and others (such as BuSpar).

480.     Defendant Team Health has, and had at the time of the incidents giving rise to this action, a duty to train and supervise its employees, including Defendant Falcon, in the proper way to treat withdrawal from benzodiazepines (such as Xanax).

481.     Defendant Team Health has, and had at the time of the incidents giving rise to this action, a duty to train and supervise its employees, including Defendant Falcon, to send a prisoner/detainee/prisoner to a facility for proper treatment if proper treatment cannot be provided at the present facility.

482.     Defendant Team Health has, and had at the time of the incidents giving rise to this action, a duty to train and supervise its employees, including Defendant Falcon, to prescribe medications that are available to a prisoner/detainee.

483.     Defendant Team Health breached its aforementioned duties.

484.     Defendant Falcon was not fit for employment as a psychiatrist working in the position which Defendant Team Health suggested.

485.     Defendant Falcon was not fit for employment pursuant to guidelines known to Defendant Team Health.

486.     Plaintiff sustained injuries as a result of the breaches of the aforementioned duties of Defendant Team Health (and Defendant Falcon), including physical injuries, psychological injuries, emotional injuries, loss of freedom, lost wages, and past and future medical expenses, among other things.

487.     Defendant Team Health is liable for the acts of its agents/employees, including Defendant Falcon, taken against Plaintiff during the course, and within the scope, of employment by Defendant Team Health under the doctrine of *respondeat superior*.

## SIXTEENTH CLAIM FOR RELIEF
### NEGLIGENCE
**As Against Defendant City of New York, Defendant Corizon, Defendant CMANY, Defendant Team Health, Defendant Falcon, Defendant Grandoit, Defendant Walker, Defendant Noel, and Defendant MDC Medical Staff**

488.     Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 487, inclusive, as though fully set forth herein.

489.     Defendant Falcon, Defendant Walker, Defendant Noel, Defendant Grandoit, and Defendant MDC Medical Staff were required to deliver a standard of care, competency, and actions to Plaintiff, which required them to follow the protocols set forth in NYCDOC guidelines for dealing with, among other things, patients with certain medical conditions, such as anxiety and depression.

490.    Defendant Falcon, Defendant Walker, Defendant Noel, Defendant Grandoit, and Defendant MDC Medical Staff breached that standard of care by failing to remove Plaintiff from the Manhattan Detention Complex and bring him to another facility, such as Bellevue Medical Hospital, New York Downtown Hospital, or at least Rikers Island, once they learned that he was having severe withdrawal symptoms, such as hallucinations.

491.    Defendant City of New York, Defendant Corizon, Defendant CMANY, and Defendant Team Health breached that standard of care by instructing Defendant Falcon to refrain from prescribing benzodiazepines to inmates.

492.    As a result of the breach, Plaintiff was caused to sustain/endure the following serious injuries, among other things: severe headaches, anxiety, mood swings, insomnia, heavy sweating, hallucinations, a grand mal seizure, fractured skull, fractured sinuses, a concussion, permanent brain damage, decrease in cognitive functioning and memory loss, a permanent scar from his fall to the floor, post-concussion syndrome, post-traumatic stress disorder, and an exacerbation of Plaintiff's pre-existing mental disorders.

493.    Defendant Falcon, Defendant Walker, Defendant Noel, Defendant Grandoit, and Defendant MDC Medical Staff took the aforementioned actions against Plaintiff during the course, and within the scope, of employment with Defendant City of New York.

494.    Defendant Falcon, Defendant Walker, Defendant Noel, Defendant Grandoit, and Defendant MDC Medical Staff took the aforementioned actions against Plaintiff during the course, and within the scope, of employment with Defendant Corizon.

495.    Defendant Falcon, Defendant Walker, Defendant Noel, Defendant Grandoit, and Defendant MDC Medical Staff took the aforementioned actions against Plaintiff during the course, and within the scope, of employment with Defendant CMANY.

496.    Defendant Falcon took the aforementioned actions against Plaintiff during the course, and within the scope, of employment with Defendant Team Health.

497.    Defendant City of New York is liable for the acts of its agents/employees, including Defendant Falcon, Defendant Walker, Defendant Noel, Defendant Grandoit, and Defendant MDC Medical Staff, taken against Plaintiff during the course, and within the scope, of employment by Defendant City of New York under the doctrine of *respondeat superior*.

498.    Defendant Corizon is liable for the acts of its agents/employees, including Defendant Falcon, Defendant Walker, Defendant Noel, Defendant Grandoit, and Defendant MDC Medical Staff, taken against Plaintiff during the course, and within the scope, of employment by Defendant Corizon under the doctrine of *respondeat superior*.

499.    Defendant CMANY is liable for the acts of its agents/employees, including Defendant Falcon, Defendant Walker, Defendant Noel, and Defendant MDC Medical Staff, taken against Plaintiff during the course, and within the scope, of employment by Defendant CMANY under the doctrine of *respondeat superior*.

500.    Defendant Team Health is liable for the acts of its agents/employees, including Defendant Falcon, taken against Plaintiff during the course, and within the scope, of employment by Defendant Team Health under the doctrine of *respondeat superior*.

501.    The aforementioned actions taken by Defendant Falcon, Defendant Walker, Defendant Noel, and Defendant MDC Medical Staff against Plaintiff were willful, wanton, reckless, and/or malicious, and therefore entitle Plaintiff to punitive damages in an amount to be determined at trial.

<u>SEVENTEENTH CAUSE OF ACTION</u>
**MEDICAL MALPRACTICE**
**As Against Defendant City of New York, Defendant Corizon, Defendant CMANY,**
**Defendant Team Health, Defendant Falcon, Defendant Grandoit, Defendant Walker,**
**Defendant Noel, and Defendant MDC Medical Staff**

502.     Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 501, inclusive, as though fully set forth herein.

503.     Defendant Falcon, Defendant Grandoit, Defendant Walker, Defendant Noel, and Defendant MDC Medical Staff were required to deliver a standard of care, competency, and actions to Plaintiff.

504.     Defendant Falcon, Defendant Grandoit, Defendant Walker, Defendant Noel, and Defendant MDC Medical Staff breached that standard of care by failing to diagnose Plaintiff with Benzodiazepine Withdrawal, including Xanax Withdrawal, in light of the obvious medical history of Xanax use and withdrawal symptoms.

505.     Defendant Falcon, Defendant Grandoit, Defendant Walker, Defendant Noel, and Defendant MDC Medical Staff breached that standard of care by failing to treat Plaintiff for Benzodiazepine Withdrawal, including Xanax Withdrawal, in light of the obvious medical history of Xanax use and withdrawal symptoms.

506.     Defendant Falcon, Defendant Grandoit, Defendant Walker, Defendant Noel, and Defendant MDC Medical Staff breached that standard of care by failing to confirm Plaintiff's medical history of Xanax use before failing to diagnose Plaintiff with Benzodiazepine Withdrawal, including Xanax Withdrawal.

507.     Defendant Falcon, Defendant Grandoit, Defendant Walker, Defendant Noel, and Defendant MDC Medical Staff breached that standard of care by knowingly prescribing medication in a dose known to be ineffective in treating someone with anxiety disorder.

508.     Defendant Falcon, Defendant Grandoit, Defendant Walker, Defendant Noel, and Defendant MDC Medical Staff breached that standard of care by knowingly prescribing medication that would not help alleviate Plaintiff's Benzodiazepine Withdrawal, including Xanax Withdrawal.

509.     Defendant Falcon, Defendant Grandoit, Defendant Walker, Defendant Noel, and Defendant MDC Medical Staff breached that standard of care by knowingly prescribing medication that would not be available to Plaintiff for days.

510.     Defendant Falcon, Defendant Grandoit, Defendant Walker, Defendant Noel, and Defendant MDC Medical Staff breached that standard of care by sending Plaintiff back to MDC with the knowledge that there would be no trained psychiatrists present.

511.     Defendant Grandoit breached that standard of care by keeping Plaintiff at MDC with the knowledge that he was hallucinating.

512.     Defendant City of New York, Defendant Corizon, Defendant CMANY, and Defendant Team Health breached that standard of care by instructing Defendant Falcon to refrain from prescribing benzodiazepines to inmates.

513.     As a result of the breach, Plaintiff was caused to sustain/endure the following serious injuries, among other things: severe headaches, anxiety, mood swings, insomnia, heavy sweating, hallucinations, a grand mal seizure, fractured skull, fractured sinuses, a concussion, permanent brain damage, decrease in cognitive functioning and memory loss, a permanent scar from his fall to the floor, post-concussion syndrome, post-traumatic stress disorder, and an exacerbation of Plaintiff's pre-existing mental disorders.

514.    Defendant Falcon, Defendant Grandoit, Defendant Walker, Defendant Noel, and Defendant MDC Medical Staff took the aforementioned actions against Plaintiff during the course, and within the scope, of employment with Defendant City of New York.

515.    Defendant Falcon, Defendant Grandoit, Defendant Walker, Defendant Noel, and Defendant MDC Medical Staff took the aforementioned actions against Plaintiff during the course, and within the scope, of employment with Defendant Corizon.

516.    Defendant Falcon, Defendant Grandoit, Defendant Walker, Defendant Noel, and Defendant MDC Medical Staff took the aforementioned actions against Plaintiff during the course, and within the scope, of employment with Defendant CMANY.

517.    Defendant Falcon took the aforementioned actions against Plaintiff during the course, and within the scope, of employment with Defendant Team Health.

518.    Defendant City of New York is liable for the acts of its agents/employees, including Defendant Falcon, Defendant Grandoit, Defendant Walker, Defendant Noel, and Defendant MDC Medical Staff, taken against Plaintiff during the course, and within the scope, of employment by Defendant City of New York under the doctrine of *respondeat superior*.

519.    Defendant Corizon is liable for the acts of its agents/employees, including Defendant Falcon, Defendant Grandoit, Defendant Walker, Defendant Noel, and Defendant MDC Medical Staff, taken against Plaintiff during the course, and within the scope, of employment by Defendant Corizon under the doctrine of *respondeat superior*.

520.    Defendant CMANY is liable for the acts of its agents/employees, including Defendant Falcon, Defendant Grandoit, Defendant Walker, Defendant Noel, and Defendant MDC Medical Staff, taken against Plaintiff during the course, and within the scope, of employment by Defendant CMANY under the doctrine of *respondeat superior*.

521.   Defendant Team Health is liable for the acts of its agents/employees, including Defendant Falcon, taken against Plaintiff during the course, and within the scope, of employment by Defendant Team Health under the doctrine of *respondeat superior*.

522.   The aforementioned actions taken by Defendant Falcon, Defendant Grandoit, Defendant Walker, Defendant Noel, and Defendant MDC Medical Staff against Plaintiff were willful, wanton, reckless, and/or malicious, and therefore entitle Plaintiff to punitive damages in an amount to be determined at trial.

**WHEREFORE**, plaintiff John William Kammin respectfully requests that this Court enter Judgment in his favor and against Defendants as follows:

a.   compensatory and punitive damages as against Defendants, jointly and severally, in an amount to be determined at trial, but not less than three million dollars ($3,000,000.00);

b.   prospective relief, a declaratory judgment, and systemic equitable reform regarding the NYCDOC's policies and protocols concerning the treatment of benzodiazepine withdrawal in New York City's jails, including, but not limited to, the Manhattan Detention Complex and Rikers Island;

c.   attorney's fees incurred during this action, pursuant to 42 U.S.C. 1988(b), the determination of which lies within the sound discretion of this Court;

d.   costs incurred during this action, pursuant to 42 U.S.C. 1988(b), the determination of which lies within the sound discretion of this Court;

e.   expert fees incurred during this action, pursuant to 42 U.S.C. 1988(c), the determination of which lies within the sound discretion of this Court;

f.      attorney's fees and costs available by federal or state law aside from that available pursuant to 42 U.S C. 1988;

g.      statutory interest on any sums awarded to Plaintiff; and

h.      such other and further relief as the Court deems proper and fair.

Dated: New York, New York
      January 6, 2014

Respectfully yours,

MARK A. MARINO, PC

Mark A. Marino (MM 0676)
*Attorney for Plaintiff John William Kammin*
380 Lexington Avenue, 17th Floor
New York, New York 10168
Tel:  212.748.9552
Fax:  646.219.5350

## CERTIFICATE OF MERIT

STATE OF NEW YORK        )
                                            )        ss:
COUNTY OF NEW YORK   )

     I, Mark Marino, am the attorney for the plaintiff, John William Kammin ("Plaintiff"), and hereby affirm the following under penalty of perjury:

     1.     I submit this Certificate of Merit in accordance with New York's Civil Practice Law and Rules § 3012-a.

     2.     I have reviewed the facts of the case and have consulted with a physician licensed to practice in the State of New York who I believe is knowledgeable in the relevant issues involved in this particular action (the "Physician").

     3.     I have concluded, on the basis of my review and consultation with the Physician, that there is a reasonable and valid basis for the commencement of this action.

     4.     I have concluded, on the basis of my review and consultation with the Physician, that there is a reasonable and valid basis for Plaintiff's medical malpractice claim.

Date:  New York, New York
       January 6, 2014

                                 MARK A. MARINO